Alexander A. SIMON, Jr.

v.

**SHEARSON LEHMAN BROTHERS, INC. and Michael Swofford.**

Civ. No. C85–2006.

United States District Court, N.D. Georgia, Atlanta Division.

Aug. 5, 1987.

Charles Campbell, Peter J. Quist and Robert Tayloe Ross, Hicks, Maloof & Campbell, Atlanta, Ga., for plaintiff.

Peter J. Anderson, Louise Bailey Matte and Sara Ford, Peterson, Young, Self & Asselin, Atlanta, Ga., and Scott E. Daniel, Hilburn Law Firm, North Little Rock, Ark., for defendants.

## ORDER

ORINDA D. EVANS, District Judge.

This action alleging slander causing loss of employment and fraud in connection with Plaintiff's commodities account is now before the court on Defendant Shearson Lehman Brothers, Inc.'s (Shearson) motion for judgment notwithstanding the verdict, new trial, or remittitur.

The jury returned a verdict in favor of Plaintiff on the slander claim in the aggregate sum of $7,000,000.

Plaintiff's claims of fraud and negligence growing out of Defendant's handling of his commodities account were also submitted to the jury. On the negligence count, the jury awarded $25,000 in damages; on the fraud count it awarded $40,997 in actual damages, plus $3,000,000 in punitive damages. Following the verdict, Plaintiff elected to accept the award on the fraud count.[1]

From December 1, 1982 through December 31, 1984, Plaintiff Simon served as financial adviser and investments manager to Burt Reynolds, the movie actor. Simon's work included oversight of Mr. Reynolds' passive investments, *i.e.*, stocks and bonds, plus development and/or management of investment projects such as an office plaza, an apartment complex, restaurants, raw land, equipment leases, etc. In exchange, Mr. Simon received equity interests in the projects, plus a percentage of Mr. Reynolds' annual income from investments and movie royalties. As is more fully set forth below, Mr. Simon, through an associate Labe Mell, caused a large portion of Mr. Reynolds' funds to be invested through the Defendant Shearson and its broker, Michael W. Swofford. Mr. Simon also hired the Defendants to invest some of his own money in bonds, and to trade commodities for him. Swofford used various deceptive or fraudulent tactics in handling Mr. Reynolds' and Mr. Simon's accounts; he actually stole over a million dollars of Mr. Reynolds' funds.

Shearson management discovered that money had been transferred out of Reynolds' account in an apparently irregular fashion. They conducted an investigation and suspended the broker, Swofford. They telephoned Mr. Reynolds' attorney on November 9, 1984, and made a report disclosing the apparently irregular transfers and the fact that they had suspended their broker.

On or about December 6, 1984, Simon was notified that his services as Mr. Reynolds' business manager were being terminated effective December 31, 1984. Simon contends that the proximate cause of his termination was an allegedly slanderous comment made about him in the November 9 phone call, namely, that according to Swofford, Simon had authorized Swofford to sign his name to a letter authorizing funds to be paid out of Reynolds' account to various persons including Simon, Simon's wife and other relatives, and Simon's comptroller. The letter did exist, but the evidence showed that Swofford never stated that Plaintiff authorized Swofford to sign his name. Instead Swofford said he signed Simon's name on instructions of Labe Mell, who the evidence showed to be Simon's agent.

Defendant denies having made the allegedly slanderous statement but claims that nonetheless the alleged statement is true in its essence. Defendant denies that any statement was made with malice. Defendant also argues the alleged slander did not cause Plaintiff's termination.

The slander claim was submitted to the jury under California law. The telephone call in question was made from Shearson's compliance department in New York City to Donald Petroni, Mr. Reynolds' attorney in Los Angeles, California. Before sending the case to the jury, the court ruled that as a matter of law, the comments made in the telephone call were conditionally privileged because of the parties' mutual legitimate interest in the subject of the phone call. *See* Cal.Civ.Code § 47 subd. 3 (West 1982). The court also ruled that Defendant's alleged statement was not slanderous per se. As a result of those rulings, the court instructed the jury that in order to recover, Plaintiff had to prove that the alleged slander was uttered with actual malice. Further, Plaintiff could only recover for slander upon proof that he had suffered special damages, *i.e.*, economic injury proximately caused by the alleged slander. In order for

---

1. During the course of the trial, Plaintiff also presented evidence as to numerous other claims, including claims pertaining to the handling of his bond account. The court directed a verdict as to all claims except for the slander claim and the fraud and negligence claims pertaining to alleged mishandling of Plaintiff's commodities account.

the alleged slander to be a proximate cause of Plaintiff's injury, the jury was instructed that the slander would have to constitute a "substantial factor" in bringing about Plaintiff's termination. The only economic injury claimed by Plaintiff was the injury associated with his termination as Mr. Reynolds' business manager.

The negligence and fraud claims pertaining to Mr. Simon's commodities account were submitted to the jury under common law principles applicable in both Georgia and Florida. The commodities account was handled by Swofford in Shearson's Little Rock, Arkansas office. The relevant correspondence and telephone calls occurred between the broker in Little Rock and Plaintiff and members of his staff in Florida.

Although the nucleus of facts relevant to the slander claim versus that relevant to the commodities account claims are not co-terminous, the simplest presentation of the facts is an overall chronological presentation, as follows:

In December, 1982, Plaintiff Simon, a resident of Boynton Beach, Florida, learned through his nephew that Burt Reynolds, a part time resident of Jupiter, Florida, was looking for a business manager. Reynolds testified he then met Simon for the first time; Simon recalled he had met Reynolds socially one time in 1961. After preliminary discussions, they agreed that Simon would become Reynolds' business manager. A written contract was executed, to expire on December 1, 1984. The contract set out a percentage basis for Plaintiff's compensation, and anticipated that Plaintiff would handle Mr. Reynolds' financial affairs and personal investments.

At the time Simon became business manager, Mr. Reynolds owned a large portfolio of bonds. These were conservative bonds, which produced relatively low yields. Plaintiff discussed the bond portfolio with Keith Bell, his personal accountant in Atlanta. Bell suggested that Simon discuss the matter with his partner, Labe Mell, who was an experienced investment advis-

er. Simon turned over information concerning Reynolds' bond portfolio to Mell for review and analysis. Mell's conclusion was that higher yielding bonds should be purchased.

There is no evidence that Simon formally hired Mell to direct bond trades for Reynolds, but the record reflects that Mell directed Swofford to make many trades for Reynolds in 1983 and 1984 with Simon's express knowledge and consent.[2] Mell advised Simon on each occasion what purchases or sales should be made, and after obtaining Simon's agreement, contacted Swofford and placed the orders.

Before Mell took on the Reynolds account, he was already using the services of Michael Carter, a broker in the Little Rock, Arkansas office of Swink and Company. Carter testified that Mell made him aware that he represented Burt Reynolds, and that they could develop a very profitable relationship if Carter would agree to split commissions with Mell. Carter testified he discussed this matter with his supervisor, and was informed that such commission splitting was prohibited by New York Stock Exchange regulations. Accordingly, Carter testified he refused to split commissions with Mell, and that Mell stopped trading with him. Mell denied that he suggested commission splitting, but stated he had told Carter he would expect Carter to compensate him for the tax advice he would be rendering to the clients.

The evidence further showed that Mell then began dealing with Defendant Michael Swofford, a recently hired broker with Defendant Shearson. Mell had known Swofford at Swink & Company. Swofford testified that Mell made him aware that he represented Burt Reynolds and other substantial interests, and that he would only be interested in using Swofford only if Swofford would agree to split commissions. The evidence showed that soon after Swofford began to sell and buy bonds for Reynolds in consultation with Mell in late 1983, Swofford began making payments to Mell

2. In the spring of 1983, Simon obtained a general power of attorney from Reynolds. The power of attorney gave Simon broad rights to act on

Reynolds' behalf, and specifically recognized Simon's right to employ agents, accountants, and attorneys.

and and his partner Keith Bell. Bell testified that he did understand that the payments were in an amount equal to one-half of Swofford's commissions on the Reynolds transactions, though he declined to characterize the payments as commission splits. Bell said he agreed with Swofford that these payments would be made in consideration of tax advice which he and Mell were providing. Mell testified that payments for tax advice were received, but stated he had no knowledge that the payments bore a relationship to the amount of Swofford's commissions. Swofford testified that Bell sent him invoices, and that the amount was set in Mell's calls to Swofford to discuss what amount would be appropriate in light of the commissions earned. The payments were mailed to Bell, who in turn disbursed Mell his portion.

There was no evidence that Mell or Bell specifically disclosed the commission splitting arrangement to Simon. However, the record does reflect that when Simon asked Swofford in July, 1984 to give him a recap of all commissions charged to the account, Swofford sent back a list of commissions and indicated in the letter that Mell and Bell had shared the commissions with him. Simon testified he asked Bell about this, and that Bell denied it. However, Simon testified he thought Bell might have told him that Swofford was paying Bell for tax advice rendered for Reynolds' benefit.

Mr. Reynolds' securities account was opened at Shearson on May 17, 1983. Simon's own account was opened June 23, 1983.

During 1983, bonds were purchased for Mr. Reynolds' account and also for Simon's account. Swofford testified that during 1983, he never spoke to Simon but rather dealt exclusively with Mell as to both Reynolds' and Simon's respective accounts. He thought the first time he dealt directly with Simon was in mid-1984. Simon testified he had spoken to Swofford in 1983, but admitted that most of the 1983 contacts with Swofford had been by Mell.

Mr. Simon made periodic written reports to Mr. Reynolds of the progress of both his passive investments and the other investment projects in which Simon was actively involved. In one such report near the end of 1983, Simon described very specifically the respects in which Reynolds' financial condition had improved. Reynolds was pleased with Plaintiff's performance, and agreed to increase his compensation from a 5% commission basis to a 7% commission basis. Reynolds' letter stating the increase said, "I very much appreciate what you have accomplished this year, and look forward to many years of successful and profitable business together."

In 1984, Swofford transferred funds to Mell and Bell in addition to making the "commission splitting/tax advice" payments. The fact that transfers or payments were made is undisputed, and it is also undisputed that Reynolds' Shearson account was the source of the funds. However, the evidence is in conflict as to the parties' understanding of the purpose of the payments. Swofford testified that Mell approached him in January, 1984 and told him the commission splitting payments were no longer sufficient compensation. Swofford testified Mell demanded that additional payments be made. Mell, on the other hand, denied this totally. He testified that while certain transfers of money had been made by Swofford to an account controlled by him and Bell at National Bank of Georgia in Atlanta (the LBM Services, Inc. Agent account), he assumed that the transferred funds were proceeds from sales of certain investments known as Balcor limited partnership units. Mell's explanation was that he, Bell and Swofford had agreed to buy and sell Balcor units on the secondary market and split profits three ways. Swofford was going to do the trading outside Shearson, as Shearson did not handle these investments. Proceeds of sales were to be sent to the LBM Agent account, and used to pay off a line of credit extended by NBG to finance the Balcor units as they were purchased.

On August 6, 1984, and September 4, 1984, the sums of $162,500 and $243,000, respectively, were transferred by Swofford directly from Mr. Reynolds' Shearson account to the "LBM Services, Inc. Agent

account" at National Bank of Georgia. There is no evidence that any Balcor units were ever bought or sold. Mell and Bell admitted that they had never seen any documentary evidence of Balcor trades. Mell used over $200,000 from the LBM Agent account to cover margin calls on his Shearson commodities account. Approximately one-third of the $405,500 in deposited funds were paid out of the account to Swofford personally.

On February 29, 1984, March 16, 1984, April 6, 1984, May 18, 1984, and July 26, 1984, Swofford caused funds aggregating $409,111.05 to be wired from Mr. Reynolds' Shearson account to Mr. Reynolds' personal checking account at Flagler National Bank in Florida. At about the time each wire occurred, Simon's comptroller in Florida, James Malte, instructed Flagler National Bank to in turn wire approximately the same amount to accounts at Twin City Bank or First American Bank, both of which were in Little Rock. These were Swofford's personal checking accounts. Swofford then wrote checks to Bell drawn on his personal checking accounts.

Mr. Malte testified that in authorizing the wire transfers from Reynolds' account to Swofford's accounts, he was acting on the instructions of Swofford and Mell. He testified he thought the transfers were to buy bonds for Reynolds, and thought that the funds were going to Shearson accounts.

Mell and Bell denied Swofford's testimony that Swofford also had traveled to Atlanta and hand delivered large amounts of cash to Mell and Bell.

In August, 1984, Swofford recommended to Simon that commodities trading accounts be opened both for Reynolds and for Simon. Mr. Simon is an experienced businessman, primarily in real estate development. He holds degrees from Georgia Tech and the Wharton School of Finance. He has considerable investment experience and had previously engaged in commodities trading. He knew that it was speculative. Simon testified that he agreed to do it only on Swofford's assurance that Shearson had a computerized program that could limit

losses and that Simon's losses would be capped at $10,000.

Simon executed numerous documents in connection with his commodities account. On August 24, 1984, he executed a printed form Customer's Agreement and also a printed form Commodity Customer Agreement. In one portion of the Commodities Customer Agreement, he placed his signature beneath the following: "I HAVE RECEIVED A SEPARATE 'RISK DISCLOSURE STATEMENT' PRIOR TO THE OPENING OF MY ACCOUNT AND UNDERSTAND IT." Below that he signed again beneath the words "I have received a separate Reg § 190 disclosure statement for Non Cash Margin and understand it." The Risk Disclosure Statement outlined the substantial risks of trading in commodity futures contracts, and specifically stated: "Placing contingent orders, such as "stop-loss" or "stop-limit" orders, will not necessarily limit your losses to the intended amounts, since market conditions may make it impossible to execute such orders." Simon did not recall receiving the Risk Disclosure Statement.

Although Simon acknowledged receiving a Non Cash Margin disclosure statement, he did not execute a separate margin agreement or any document reflecting his understanding that Shearson would extend him credit. The Customer's Agreement and Commodity Customer Agreement referred to above contain various provisions which generally provide that if the account is operated on a margin basis, then certain additional rights accrue to Shearson. The Commodity Customer Agreement contains a provision to the effect that Shearson has a lien on any property of the customer in Shearson's possession to satisfy any obligations of the customer. It also provides that the customer will maintain "such collateral and/or margin as you may from time to time in your discretion require. I also agree to pay immediately on demand any amount owing with respect to any of my accounts."

On September 24, 1984, Simon signed a further document entitled Commodity Account Limited Discretionary Authorization.

He testified he signed the document in blank. The document had a blank space for the name of the particular broker to whom discretionary authority was being granted. Simon had intended that Swofford's name be put in that space; however, after the form was received back at Shearson, Swofford filled in the name of Terry W. Bishop. Bishop, unlike Swofford, was an experienced commodities trader. In the space on the form captioned "Reason for Granting Discretionary Authority," Swofford wrote "For hedging purposes." On August 24, 1984, Simon signed a "Commodity Hedge Letter," reflecting Simon's intention to buy and sell financial futures and verifying that these would be bona fide hedge transactions. The effect of this representation was to give Simon the benefit of the more favorable margin requirements which apply to hedge transactions.

Swofford never requested or obtained any money directly from Simon for his commodities account. Simon testified that on an unspecified date when he asked Swofford how much money to send, Swofford told him it was unnecessary to send money because he had already made $10,-000.

Swofford made the first trade in Simon's account on August 24, 1984, selling short ten September, 1984 futures contracts.[3] Another similar short sale was made on August 27, 1984. On August 28, 1984, Swofford, without communicating with Simon, caused funds to be advanced for Simon's benefit, using Simon's bonds as collateral. $37,042 was then transferred from Simon's securities account to his commodities account. On August 29, 1984, $3,945 more was advanced in the same manner, for a total of $40,997 in transferred funds. These funds were required to collateralize Simon's contingent liability on the commodities trading. Simon received Shearson's margin call, which had been mailed August 28, on September 4. He sent no money or collateral.

On September 5, 1984, Swofford purchased twenty futures contracts, to produce a gross gain in the commodities account of $8,125. On September 5-6, Swofford sold short twenty additional futures contracts. On September 17, 1984, Swofford bought twenty of the same futures contracts to cover the September 5-6 short sale. However, between September 6 and 17, the price of the contracts had risen. This produced a loss in Simon's commodities account of $54,638.10. Shearson sent Simon a confirmation reflecting the fact and amount of the loss, but Simon did not receive this until September 27, 1984.[4] Simon testified at trial that at some point near the time when the commodities account was opened, he established an understanding with Swofford that losses would be limited to $1,000 per day, or $10,000 in the aggregate. He contends that Swofford disregarded his instructions in allowing the $54,638.10 loss and deceived him by leading him to believe that the loss was capped at $10,000.

In mid or late September, 1984, Swofford began reporting to Simon that large profits had been made in both Simon's and Reynolds' commodities accounts. In fact, Swofford never traded Simon's commodities account after the transaction of September 17, 1984, which left a loss of $54,638.10.[5] Swofford admits that he intended to deceive Simon, as he feared that Simon's knowledge of the losses would cause loss of the Reynolds account.

At some point in September, 1984, Simon instructed Swofford to open commodities trading accounts for various of his relatives and employees, namely: Dona Simon, Richard Simon, Richard Machek, Dudley Remus, Salah Sawaya, John Zaine, Ernest Simon, Charles Simon, Roy Simon and

---

3. At about the same time, commodities trading accounts were opened for Eassa Properties, Inc., which was owned by Simon's family, and for Mell, Bell, and their company, LBM Services, Inc.

4. Simon had moved his office location, and the Shearson mail went to the old address. This caused a delay in Simon's receipt of mail from Shearson in August and September, 1984.

5. The net debit after applying the $40,997 in transferred funds was later written off by Shearson. However, there is still a lien against Simon's bonds resulting from these transactions.

James Malte. None of these individuals sent any money, either. Most of them executed no documents to open accounts. No trades were conducted for any of them. In short, they had no accounts. However, Swofford orally reported to Simon that all of then were making money, and Simon testified as to precise amounts which Swofford had represented were the profits in each of the accounts on September 24 and October 4.

On October 4, 1984, Swofford reported to Simon that Burt Reynolds' commodities account had made $368,000 in profits, that Simon had made $227,600, and that Eassa Properties had made $196,500. He reported smaller profits for the other (non-existent) accounts.

Simon further testified that on October 4, 1984, he told Swofford to close all of the securities and commodities accounts immediately. Simon testified he did this because the accounts had done well, and he felt the time was right to close them. Swofford denied that Simon told him this. In any event, Simon dispatched Keith Bell as his representative to Little Rock on October 5, 1984. Bell gave no testimony concerning the perceived purpose for this trip. He did testify that he reviewed the accounts, and obtained copies of profit and loss analyses. These documents reflected that the commodities accounts of Reynolds, Simon, Mell and Eassa Properties each had substantial losses. At the same time, Swofford gave Bell checks payable to Reynolds and to Eassa Properties which Swofford stated were commodities profits for their accounts.[6] Bell took the account documents and the checks to Simon.

On October 8, 1984, Simon received his September commodities statement from Shearson. This statement reflected that he had a loss in the account of $54,638.10. During mid-October, James Malte spoke with Rick Wheeler, assistant manager of Shearson's Little Rock office, numerous times to discuss the status of all of the

bond and commodities accounts. In these calls Wheeler told Malte that there were significant losses in all the commodities accounts.

There is nothing in the record to reflect that as of October, 1984, Mr. Reynolds had any specific concerns about the handling of the Shearson account. However, there is evidence that Mr. Reynolds and persons associated with him were dissatisfied in other respects with Simon. David Gershenson, a trusted advisor and publicist for Reynolds, testified by deposition that in August, 1984, he became aware that Reynolds had given Simon a power of attorney. He testified he explained to Reynolds the far-reaching nature of this instrument, and discussed his concerns that conflicts of interest were inherent in his arrangements with Simon. He suggested that Reynolds undertake a legal audit, which Reynolds later did beginning in October, 1984.[7] Gershenson told Reynolds he thought the audit would disclose some irregularities. Gershenson sent Simon a strongly worded letter dated October 15, 1984, in which he complained about Simon's giving information concerning Reynolds' financial affairs to the press. A carbon copy of the letter was sent to Reynolds. The letter stated in part:

> That Burt's involved with Po Folks is a matter of public record. But the P.B. Life writer didn't need to be given information re "143 restaurants in Florida, Georgia and Texas." Reynolds Plaza is also a matter of public record but the p.B. Life write didn't need to be given the 4.2 million figure, or *any* figure. That may look good for you, but not for Burt.
>
> \*  \*  \*  \*  \*  \*
>
> It seems a bit ridiculous, but the only other approach I can think of is to start communicating with you in writing—with a copy to Burt. If you don't care about what I have to say or in working togeth-

---

6. Bell received the account documents from Terry Bishop, another broker at Shearson who had been working with Swofford on the commodities trades. The checks representing sup-

posed profits were given to Bell by Swofford, apparently out of Bishop's presence.

7. This was not unique to Simon. Reynolds had audited other business managers.

er as a team, perhaps you'll care about what Burt might have to say. And it's *his* welfare I'm trying to protect and promote—not mine. It doesn't hurt me when people give information to the press that shouldn't have been given. It hurts Burt. (emphasis in original).

Gershenson further testified that among persons close to Reynolds, there was a general feeling that Simon did not function as part of a team. In particular, Gershenson mentioned Elaine Deacy Price, food & beverage coordinator for Reynolds' dinner theatre in Jupiter, Florida. She was also Mr. Reynolds' secretary in Jupiter. On September 4, 1984, Elaine Price wrote a letter to Simon detailing, in very strong language, various grievances. She signed Mr. Reynolds' name with his authorization. The letter began by stating:

First off, I have tried to get through to you on numerous occasions as to the importance of being a team member as long as you are a part of my organization; however, it seems that you have been unable to accomplish this over the past two years you have been my business manager.

The letter than recounted specific instances where Plaintiff had had difficulty in working with other members of the Reynolds organization. The letter closed with the following:

Sandy, the most devastating part of all this is the lack of respect and the tremendous distrust of all the people who are vital to me for you. I can't have this. If it were only one or two, it would be one thing, but not my whole family and everyone connected with my business!

Simon testified that he subsequently met with Mr. Reynolds on September 5 to discuss business matters, at which time Mr. Reynolds discounted the Price letter and said "Don't worry about it. Just do your job." However, Plaintiff's own notes of agenda items for an October 17, 1984 meeting with Mr. Reynolds document his concern that he did not enjoy Reynolds' trust to the same extent as previously. Specifically, the note states:

Meeting with Burt

1. When he came to Jupiter all was fine:
    a. offered me the Jupiter lot, + 600,-000
    b.  "         " to buy the el dorado.

*Now* something has changed that hurts our *trust*. The *most* important thing we need.

Early in October, 1984, the law firm of Nixon, Hargrave, Devans & Doyle was employed to provide an overall picture of Reynolds' legal-financial life. On October 22, 1984, Simon's power of attorney for Reynolds was verbally suspended, on advice of one of the Nixon, Hargrave attorneys.

On October 15, 1984, Simon wrote to Reynolds reminding him that in six weeks their agreement would expire. He said he very much wanted to continue as Reynolds' manager, and suggested they discuss the matter. Reynolds did not respond to the letter.

In the meantime, Swofford was being pressured to send Simon the profits he had orally reported to be in the various commodities accounts. Of course, most of these accounts just did not exist and none of the accounts had any profits. On October 9, Swofford caused Shearson checks to be prepared, payable to each of the following individuals in the indicated amounts: Dona Simon, $14,600; Salah Sawaya, $8,400; Richard Simon, $13,200; Richard Machek, $25,000; Jim Malte, $56,000. Swofford also caused checks to be drawn payable to Burt Reynolds in the amount of $108,000, Keith Bell in the amount of $58,-900, Labe Mell in the amount of $121,000, and L.B.M. Services, Inc. (Mell and Bell's company) $82,000. All of the checks were to be paid out of funds in Mr. Reynolds' account as to which Mr. Simon held the power of attorney. Swofford sold some of Reynolds' bonds to produce enough cash to cover the checks. However, the persons at Shearson's Little Rock branch whose signatures were required on the checks declined to sign them without evidence of authorization from the account holder. At that point, Swofford presented a letter, the text of which is as follows:

October 9, 1984

Shearson American Express
One Union National Plaza
Suite 1880
Little Rock, Arkansas 72201

To Whom it May Concern:

Please accept this letter as authorization to distribute funds and or pay checks from the account known as Sandy Simon as Power of Attorney for Burt Reynolds Account number 470–12195–1–3–231. Funds will be distributed to the following individuals and or corporations: Alexander A. Simon, Keith P. Bell, Labe Mell, Dona Simon, Salah Sawaya, Richard Simon, Richard Machek, James Malte, L.B.M. Services, Essa Property Corporation. I will from time to time give my instructions to Mike Swofford as to the distribution of funds.

Thanking you in advance for your cooperation

Sincerely,

/s/ Alexander Simon

Alexander A. Simon, Jr.

Mr. Simon's signature on the letter was also questioned by branch personnel as it did not appear to match his signature as reflected on other documents. Swofford initially claimed the signature was Simon's, then admitted that he signed Simon's name, claiming that he had done this as an accommodation because delivery of a letter of authorization signed by Simon had been delayed. Swofford further stated, and again so testified at trial, that Labe Mell had told him to sign the letter on Simon's behalf. Mell denied this.

On October 10, Ivol Crace, Branch Manager of Shearson's Little Rock office, notified Joseph Del Duca, head of Shearson's compliance department in New York City that Swofford had signed a customer's name to a letter of authorization. Crace was advised to dispatch Swofford immediately to New York to meet with compliance officials.

According to Swofford's testimony, he called Mell on October 10 and told him the forgery had been discovered. Swofford testified that Mell then stated that he would "take care of it." This testimony of Swofford's was denied by Mell.

Instead of going directly to New York City, Swofford flew to Delray Beach, Florida where he met in Simon's offices with Bell, Mell, Simon and Malte on October 10 and 11, 1984. There is conflict in the evidence as to whether the topic was generally the status of all the accounts, specifically, Simon's desire to close the accounts, or whether it centered on the hoped-for commodities profits. Simon's testimony is that he pressed Swofford for information concerning certain transactions in Reynolds' account which appeared irregular. In any event, Swofford assured Simon that by October 15, "everything" would be straightened out.

On October 11, Swofford called Wheeler and Crace from Florida. He told them they would shortly be receiving a good letter of authorization, and that he was on his way to New York to meet with compliance officials.

On October 12, Swofford met with Joseph Del Duca and Jack Intemann of Shearson's compliance department. Swofford told them that he had signed the letter of authorization to accommodate the account on the instructions of Mell and that Mell had been directing trades in the account. Swofford was reprimanded for signing the letter and for trading on the oral instructions of Mell. Del Duca then called Ivol Crace and told him to call Simon to make sure he was aware of the letter of authorization.

On October 12, Crace, in the presence of Rick Wheeler, called Simon. Precisely what was said during their conversation is unclear. Plaintiff, while admitting some difficulty recalling, testified that Crace did not ask him whether he was aware of a letter of authorization, but rather, asked how things were going in the account. Simon testified that he volunteered in the course of the conversation he was going to send them a letter of authorization. Crace testified that in response to his inquiry, Simon said he was aware of the fact that Swofford had signed his name to a letter of authorization, and that he was sending a "new" letter of authorization. Wheeler

heard only Crace's end of the conversation and agreed that Crace had asked if Simon was aware of the letter of authorization.

In a few days a letter of authorization dated October 12, 1984 signed by Simon arrived. As Crace had requested, it was notarized and was on letterhead of Reynolds & Simon, Inc. The text of that letter was as follows:

October 12, 1984

Mr. Ivol Crace

Shearson, Lehman/American Express

1 Union National Plaza

Suite 1880

Little Rock, AR 72201

Re: Accounts of Burt Reynolds, Alexander A. Simon, Jr., Eassa, Richard Machek, Salah Sawaya, Richard Simon, Dona Simon, John Zaine, Ernest Simon, Charles Simon, Roy Simon, Mishnoon, and Eassa Properties.

Dear Ivol,

This letter is authorization for either Keith P. Bell, Labe Mell, or James A. Malte to act in my behalf to obtain funds for the above referenced accounts, or to request and/or arrange for delivery of securities or funds in their behalf to them. Further, they are authorized to request any and all information, documents, confirmations of any and all trades for the above referenced accounts.

For your information, Eassa Properties is a Florida partnership of Alexander A. Simon, Jr. Ernest G. Simon, Roy M. Simon, and Charles J. Simon.

Attached is my Power of Attorney for Mr. Burt Reynolds for your record. If any have any questions, please feel free to give me a call so that we can proceed with clarifying these accounts in the best interest of all concerned, including your company.

Sincerely,

/s/ Alexander "Sandy" Simon

Alexander A. Simon, Jr.

Enclosure

AASjr/wdm

Subscribed and sworn to before me this 12th day of October, 1984.

/s/ _____

Notary Public

Crace did not see the letter when it arrived, as he was out of town. However, he was told that the letter had arrived. He notified compliance officials that the account holder had been aware of the letter of authorization and in fact had sent another one. This development was reported to Peter Kujawski, Shearson's Chief Deputy Counsel.

On or about October 13, 1984, Swofford mailed to Simon's home in Florida checks drawn on Swofford's personal checking account. The checks were represented to be commodities profits. They were payable as follows: AA Simon $25,000; AA Simon $5,180; Dona Simon $14,600; Richard Simon $13,200; Richard Machek $25,400; James Malte $61,900. The payees sought to negotiate the checks, but none were paid due to insufficient funds in Swofford's account.

On October 18, 1984, $201,000 was wired from Burt Reynolds' Shearson bond account to Simon's personal bank account at Colonial Trust Company. Malte testified that this transfer occurred after a call from Shearson requesting instructions for sending commodities profits to Reynolds, Simon and Eassa Properties. Malte testified he gave Shearson account numbers for both Reynolds and Simon at Colonial Trust. Both individuals maintained accounts at that bank. Shearson's wire instructions for the $201,000 bore Mr. Reynolds' name, but Simon's account number. Simon testified he thought the $201,000 deposit to his account represented commodities profits.

On October 19, Messrs. Wheeler and Crace received a phone call from James Malte and learned from him that Swofford had sent him a personal check for over $61,000 of commodities profits. Malte stated Swofford's bank had indicated the check probably would not clear. Wheeler pointed out to Malte that he had never had an account at Shearson. Malte stated he understood Swofford had done the commodities trading through another brokerage firm. At this point, Crace contacted Mr. Del Duca at Shearson's compliance depart-

ment again. Del Duca advised that they should get a written statement from Malte.

In the meantime, Swofford had never returned to the office following the trip to New York. On October 22, he was suspended for failure to report to work and for failure to communicate with the office.

By coincidence, the attorneys conducting the legal audit for Reynolds also suspended Simon's power of attorney on October 22. This was totally unrelated to the Shearson developments, none of which were known to Reynolds or his attorney.

On October 30, 1984, Peter Kujawski, Chief Deputy Counsel for Shearson, flew to Little Rock along with Jack Intemann of the compliance department to meet with Swofford. Swofford was reached at his home and agreed to meet with them at a restaurant in Little Rock. In the meeting, Swofford stated that he had been splitting commissions with Mell and Bell, who worked with Simon. He further stated that $405,000 had been transferred from Reynolds' account to the L.B.M. Services, Inc. agent account in Atlanta, which was controlled by Mell and Bell. Swofford repeated his earlier statement that the October 9 letter of authorization had been signed at the request of Mell. Swofford related that he had maintained an account for Mell and Bell from which he disbursed funds to third parties at their direction.

The next day, a meeting was held at Shearson's Little Rock office to discuss the status of the Reynolds account. Simon sent Labe Mell to the meeting as his representative. The other persons present were Messrs. Kujawski, Intemann, Crace and Wheeler. In the course of the meeting, Kujawski related to Mell what Swofford had said the preceding evening concerning the commission splits and Mell's involvement in the transfer of funds. Mell denied receiving a portion of Swofford's commissions. He stated he was unaware of the $405,000 worth of transfers into the LBM agent account, though he stated the account existed and had been established for purposes of Balcor trading in conjunction with Swofford. Mell stated he would provide records to document this, but he never

did. Mell reported to James Malte after the meeting but did not tell of the discussion concerning the commission splits or transfers.

Pursuant to Shearson's request, Malte sent a letter to Ivol Crace on November 5 confirming that Labe Mell was authorized to direct trades in Reynolds' Shearson account.

In the course of reviewing Reynolds' accounts on November 7, 1984, Jack Intemann in Shearson's compliance department reviewed documents which showed that money from the LBM Services, Inc. agent account had been used to pay funds for Mell's commodities losses at Shearson.

Shearson's Chief Deputy Counsel Peter Kujawski decided to contact Mr. Reynolds on November 9, 1984. He and Intemann placed the call. They did not speak to Reynolds, but rather were routed to Donald Petroni, Mr. Reynolds' attorney at O'Melveny & Meyers in Los Angeles. They explained that they were calling to report apparent serious irregularities in Mr. Reynolds' account. While Mr. Petroni knew who Mr. Simon was, until this point he was unaware that Reynolds had an account at Shearson. He had never heard of Labe Mell or Keith Bell. Partway through the phone call, he requested a moment to get something to write on. He then proceeded to commit to writing the basic points of the conversation.

Petroni's deposition was read at trial. Petroni testified that he took notes during the phone call from Kujawski. He was asked to read his handwritten notes, which he did as follows:

A. You don't want me to interpret what I'm reading, you just want me to read? All right.

"They said there's an account in Little Rock, Arkansas, one and a half years old, Burt Reynolds' municipal bond account, 3 to 4 million dollars average balance. The advisers were Labe Mell, Sandy Simon, Keith Bell, who worked for Mell, and James Malte. They told me that on October 9, 1984 a Shearson employee attempted to withdraw $489,000 in checks. These checks were to Keith Bell in the

amount of $58,000; Labe Mell in the amount of $121,000; Dona Simon in the amount of $14,600; Sala Sawaya in the amount of $8,400; Richard Simon in the amount of $13,200; Richard Machek in the amount of $25,000; James Malte in the amount of $56,000; LBM Services in the amount of $82,000; and Burt Reynolds in the amount of $108,000.

"The checks were never issued, and there was no check for Sandy Simon or Eassa Properties Corporation, although the October 9th, 1984 letter had mentioned them as possible payees.

"These checks were to be issued pursuant to a letter from Sandy Simon to Shearson. A Shearson employee says, however, that he signed Sandy Simon's signature to that letter, but he said he signed it on Sandy Simon's instructions.

"The Shearson Little Rock branch manager presumably called Sandy Simon who confirmed that and said his letter would be sent by federal express immediately. It never arrived in Little Rock. The employee, Michael Swofford, was suspended for having signed the letter.

"In reviewing Burt's account, they found that other funds had previously been wired out of this account to a Bank in Atlanta. On August 6, 1984, $162,500 was wired to the National Bank of Georgia for the account of LBM Services, agents.

"On September 4 1984, $243,000 had been wired to the National Bank of Georgia for the account of LBM Services, agents.

"Money was wired from the National Bank of Georgia to Shearson in New York for the personal account of Labe Mell. There were a series of checks, one for $30,000 on September 13th, '84; one for $52,700 on July 19th, 1984; one for $16,000 on August 20th, 1984; and they said there may be more.

"They also said there were sizeable commodity losses, $210,000 for Burt in the Little Rock account. Also, there were losses in the personal accounts for Mell, Simon, and Bell. They said the total losses in commodities is slightly more than $700,000

"Swofford said that he was only following instructions of the investment advisors. He said he was asked for kickbacks to the advisers, and that they were paid. He remembers a check to Bell for $30,000 paid out of his own personal account. Shearson hadn't actually seen his personal account at that time. Swofford also says that the advisers would give him big checks for him to deposit in his personal account with instructions to send series of checks to other individuals.

"He says he was told not to ask where the money came from. A power of attorney in Simon's name is the only document in the file at Shearson in Little Rock that it was used to open the account. Then I have names of the people I talked with; Peter Kujawski, who is deputy general counsel of Shearson, and Jack Intemann from Shearson compliance.

"Then there was a footnote they had received a phone call the day before from a reporter in Little Rock asking about the firing of Swofford. They had talked to Mell who denies giving Swofford any instructions, receiving any kickbacks, says the broker exceeded his authority in the commodity account, and he denied knowledge of transfers to Shearson in New York.

"They had called Sandy Simon but hadn't talked to him. That's the end of the notes."

Petroni testified that after the telephone conversation, he called Mr. Reynolds and spoke with him. He declined, on grounds of attorney-client privilege, to say what he told Reynolds.[8]

Simon testified that on November 10, 1984, he received a telephone call from Reynolds. Reynolds testified in his deposition that he did not recall the phone call, but he did not deny making it. Simon's testimony concerning the telephone call was as follows:

8. At trial, Simon testified it was untrue that Kujawski had been trying to reach him. He testified that on the contrary, Kujawski had failed to return Simon's call.

A. My wife answered the phone and told me Burt was on the phone, and so I took the call, and he said that he had just been talking with Donald Petroni, his attorney, for several hours, and that he had—he was very upset about the meeting and said that he had seen a letter with my signature on it authorizing monies to be transferred from his account to my account, my wife's account, my cousin's account, my brothers' accounts, and who in the—and I won't say the word—are these people and how could you do such a thing to me? How could you do it?

And I said, "I don't know what you are talking about."

He said, "How could you do it? How could you take money from my account?"

And I said, "I don't know what you are talking about."

He said, "There is a letter here that has got your signature on it. I am told you authorized it," and I just—it is the worst thing that has ever happened to me.

And I said, "I don't know what you are talking about. I will take a lie detector test."

And he said, "Well, I just can't believe you would do this," and after a couple minutes he hung up.

\*  \*  \*  \*  \*  \*

So, I talked about it with my wife, and then I called Labe Mell and asked him if he knew of such a letter, and he said he had seen it at Little Rock.

I said, "What letter are you talking about."

He said, "Well, you authorized it."

"I said, I authorized nothing." (TR. 130)

Simon further testified that in subsequent days and weeks, he tried numerous times to call Reynolds, however, Reynolds consistently failed to return his calls.

Simon called Petroni, and told him that he knew nothing about the October 9 letter of authorization.

On November 13, 1984, a meeting was held at the Jupiter, Florida office of the Nixon Hargrave firm which was conducting the legal audit of Mr. Reynolds' affairs. This meeting was arranged by Mr. Petroni. The persons in attendance were: Petroni, a representative of Nixon Hargrave, Mr. Simon and Jim Malte. Simon took notes of the meeting and on November 14 prepared a memo to file which was introduced into evidence at trial. The memo states in part as follows:

For the first hour, Donald Petroni outlined those points of information given him by Mr. Peter Kujowski, attorney for Shearson in New York, relating to the forged letter of October 9, 1984, purportedly signed by A.A. Simon, authorizing funds to be sent from Burt's account to the following individuals. Subsequent instructions were to following regarding the amounts:

| | |
|---|---|
| Burt Reynolds | $108,000 |
| Keith Bell | $ 58,900 |
| Labe Mell | $121,000 |
| Dona Simon | $ 14,600 |
| Salah Sawaya | $ 8,400 |
| Richard Simon | $ 13,200 |
| Richard Machek | $ 25,000 |
| Jim Malte | $ 56,000 |
| LMB Services, Inc. | $ 82,000 |

We were told that Shearson/American Express determined not to authorize these checks to be sent on that date, October 9. Petroni stated that Ivol Crace, branch manager of Shearson in Little Rock, AR, stated that I, A.A. Simon, had confirmed to him over the telephone that the forged letter in fact was written with my authority, and that a confirming letter from me would be sent. Of course, no such letter went out, and I quickly denied that I ever authorized or signed that letter.

By prearrangement with Petroni, Peter Kujawski telephoned during the meeting. Petroni's notes reflect that Kujawski went over the status of Reynolds' accounts, including specific income and disbursement items. Petroni in turn related these to the assembled group. One of the disbursement items was a $201,000 disbursement on October 18, 1984. Simon spoke up and said that was a transfer to Reynolds' ac-

count at Colonial Trust Bank. He assured Petroni that that account was "intact." Petroni asked for copies of Reynolds' Colonial Trust statements so he could verify the deposits. They were provided.

On November 14, 1984, Simon wrote to Donald Petroni, commenting that he felt the meeting on the preceding day had been helpful and stating in part:

> During the next several days our staff, led by Jim Malte and including Labe Mell, will be reconstructing from beginning to present the whole Shearson experience.

On November 16, 1984, counsel conducting the legal audit sent Simon a letter formally revoking the power of attorney.

At about the same time, Simon was notified that Reynolds' Colonial Trust statements revealed that the $201,000 deposit had not been made to Reynolds' account. Rather, it had gone into Simon's account. On November 18, 1984, Simon reimbursed Reynolds.

In mid-November, 1984, David Gershenson (Reynolds' publicist and advisor) called Stanley Fimberg, an attorney in Beverly Hills who at that time was Dinah Shore's manager.[9] Gershenson and Fimberg had been friends since childhood. Gershenson asked Fimberg to assist Mr. Reynolds in investigating his financial affairs with the possibility of becoming Reynolds' new manager. Fimberg made two trips to Jupiter, Florida toward the end of November and beginning of December. He met with Petroni, Simon, and the attorneys conducting the legal audit to acquaint himself with the state of Reynolds' affairs, including the Shearson debacle.

In the meantime, Reynolds' attorneys met with Labe Mell on November 21, 1984, and requested repayment of the $405,500 which had been improperly paid from the Reynolds account to the LBM Services, Inc. Agent account. Mell stated he would re-

pay the funds, but only if he were given a "hold harmless" agreement. This condition was refused. Mell and Bell never repaid any of the $405,500.

At around the beginning of December, 1984, Stanley Fimberg told Burt Reynolds he should terminate Simon. Reynolds agreed. On December 6, 1984, the Nixon Hargrave firm sent Simon a letter terminating him as Reynolds' business manager effective December 31, 1984.[10]

The record contains considerable evidence bearing on the question of what caused Mr. Reynolds' to terminate Simon. Simon testified that in his opinion, it was the false comment Kujawski made in the November 9 telephone call to the effect that, "According to Swofford, Simon instructed Swofford to sign the letter." In reality, Swofford had said that Mell authorized him to sign the letter. Simon points to one of the comments made by Reynolds in the November 10 telephone call to him, namely, "There is a letter here that has got your signature on it. I am told you authorized it." However, in his deposition prior to trial, Simon had opined that the reason he was terminated was the $201,000 transfer from Reynolds' Shearson bond account to his personal account. He explained at trial that in retrospect, this earlier assessment had been incorrect.

Mr. Reynolds testified extensively by deposition as to his reasons for terminating Simon. He gave primary emphasis to personality factors, pointing out that he had told Simon when he was originally hired that it was very important to get along with his family and persons associated with the dinner theatre in Jupiter because they were "very, very important to my life." However, Reynolds' father disliked Simon intensely and thought he was arrogant. Elaine Price and David Gershenson, both important members of Reynolds' staff, did not get along with Simon. Reynolds' reached the conclusion that Price and Ger-

---

**9.** Fimberg became Reynolds' business manager in 1985.

**10.** On the same day, counsel sent a demand letter to Shearson, stating a preliminary estimate that Reynolds' loss was in the sum of

$1,628,743, plus interest and costs. In early 1985, a settlement of over $1,000,000 was agreed on. Also, in 1985 Michael Swofford was indicted, pled guilty and at the time of the instant trial was serving his sentence.

shenson were correct in faulting Simon for the poor relationship. In September, 1984, Reynolds was embarrassed by Simon when he was seated in a theatre box with President and Mrs. Reagan, and Simon attempted to push past the Secret Service men. Reynolds specifically stated that prior to October, 1984, he thought his relationship with Simon was going to end.

Reynolds admitted that he had learned of the Shearson problem from Donald Petroni on or about November 10, 1984, and that Petroni's information left him with the impression that Simon was involved in criminal activity. As of that date, he had not made a firm decision whether to terminate Simon. However, he did not recall ever seeing the October 9, 1984 letter bearing the forged signature of Simon, and he further did not recall ever discussing the letter with anyone.

Reynolds was never asked whether the allegedly slanderous comment of Kujawski's contributed to his decision to fire Simon. Reynolds testified that he did not terminate Simon immediately after his November 10 discussion with Petroni, because Petroni advised him not to do that. Reynolds said that "... I had advice from my lawyer to go through the legal ramifications of what was going on with Shearson."

At the end of his deposition, Reynolds stated the following in response to the question "What was the principal reason you terminated him?"

A. I think we covered all that. It was a block house, wasn't it? It was falling apart. It started with the people in the theatre. Then it started with my family. It happened at the theatre in Washington. There were incidents that were happening time and time again.

David Gershenson, who became Reynolds' overall manager in January, 1986, testified by deposition that even before the Shearson situation, Simon was "half way out the door." He opined that even if the Shearson matter had not occurred, Simon would not have been retained. He stated that Reynolds had become increasingly aware of Simon's inability to get along with people, and his "lying and circuitous activi-

ty." Gershenson advised Reynolds "as strongly as I possibly could" that he should no longer be involved with Simon. Before the Shearson situation came up, he told Reynolds that he feared Simon's role as advisor and co-venturer involved conflicts of interest. He warned Reynolds to suspend the power of attorney and recommended a legal audit.

Gershenson also testified that when Petroni first advised him of the problem at Shearson, he specifically asked Petroni whether Simon was involved directly "in terms of stealing money, embezzling, or doing anything like that." Petroni told him at that time that "nothing was known other than the money was gone. There was no evidence either way."

Donald Petroni's deposition was also read to the jury. He refused to relate what he had said to Reynolds following the telephone from Peter Kujawski on November 9, but he generally described the investigation he had undertaken on Reynolds' behalf following the phone call. He stated that the investigation yielded no information that Simon wrongfully received Reynolds' funds, but at the same time, he was never able to determine one way or the other whether Simon had authorized the October 9 letter.

Stanley Fimberg, who investigated the Shearson matter on Reynolds' behalf, also testified by deposition. He testified that shortly after November 9, he was called by David Gershenson who asked him to assist Reynolds in investigating the status of Reynolds' financial affairs, plus possibly to become Reynolds' business manager. Fimberg made two trips to Jupiter, Florida on Reynolds' behalf. He reviewed the legal audit which then had been reduced to writing by Nixon Hargrave; he also talked with Simon, Petroni and others. He then met with Reynolds and reported to him. In response to the question, "What did you tell him?," Fimberg testified:

Well, I told him that, yes, the Shearson transaction was a very, very serious problem. I did not know frankly who had done what to whom, or the whys and wherefores, but I knew he was out a

substantial amount of money, and there was a very, very serious problem. I also told him I had a disagreement with Mr. Simon about the nature of how his deals were structured, and that I thought that ought to be resolved, and we ought to get a written settlement with Mr. Simon, and it would be presently in Mr. Reynolds' best interest at that point in time if he did, in fact, carry through with the termination of Mr. Simon.

Fimberg further testified that shortly after Simon's termination, he had told Simon why Reynolds terminated him. In response to the question, "What did you tell him?," Fimberg testified:

A. Pretty much that—really, the Shearson matter had totally unsettled Mr. Reynolds, that it had shaken his trust to a major extent, and that because that trust had been shaken, and because he had a partnership relationship with Mr. Simon in a variety of other ventures, that it would be best to separate. It's very hard to be a partner with somebody when that trust has been shaken whether that trust has been shaken rightly or wrongly.

Simon admitted that Fimberg had made this statement to him shortly after his termination.

Fimberg was asked specifically what he meant by "Shearson situation," or the "Shearson transaction." He said:

Oh, I think we all knew what was meant at that time. I think what I basically told him was because of all that had happened, the wires going to those strange places, the amount of trust placed in Mr. Swofford, all of that, that I thought the relationship was irreparable, the breach in their relationship was irreparable.

## LEGAL DISCUSSION

### A. The Slander Claim

Defendant moves for judgment notwithstanding the verdict on Plaintiff's slander claim; alternatively, Defendant seeks a new trial or remittitur of the damages.

Defendant argues in support of its motion for judgment notwithstanding the verdict that the evidence at trial was insufficient to raise a jury issue as to the elements of (1) actual malice, (2) truth of the allegedly slanderous statement, and (3) the causal relationship between the alleged slander and Plaintiff's termination. If Defendant is correct as to any one of these arguments, the motion must be granted.

On a motion for judgment notwithstanding the verdict, the court may not weigh the evidence or judge the credibility of witnesses. Conflicts in the evidence must be resolved in favor of the party opposing the motion, who also is entitled to the benefit of all favorable reasonable inferences which may be drawn from the evidence. Under these standards, the court is only to determine whether rational jurors could only reach one conclusion, namely, that advanced by the party filing the motion. *See Rabun v. Kimberly-Clark Corp.*, 678 F.2d 1053 (11th Cir.1982).

Initially, the court must address the issue of how much weight to place on the literal text of Petroni's notes, which are the exclusive source of evidence that the Defendant in fact made a slanderous statement. Defendant argues that it is not reasonable to assume that Petroni's notes literally reflect what Kujawski said, pointing to the fact that Petroni did not begin taking notes at the beginning of the conversation, but rather at some later point. Thus, Defendant argues that there was not sufficient competent evidence to permit the jury to determine that Defendant made a defamatory remark.

■ The court finds that the jury was entitled to infer that Petroni's notes had a great deal of accuracy. The jury was entitled to reason that since the matter was one of obvious importance to Petroni's client, and Petroni had no prior familiarity with the matter involved, he likely would have made careful notes and likely would have carefully relayed them to his client. Therefore, the court will accept Petroni's notes as read in his deposition testimony to the jury as the basis for analyzing Defend-

ant's arguments with respect to the slander count.

■ The court first turns to Defendant's argument that Kujawski's statement, "According to Swofford, Simon instructed Swofford to sign the letter," is not actionable slander because it is true in its essence. Defendant argues that because Mell was Simon's agent, a statement by Swofford that Mell instructed him to sign the letter is the equivalent of saying that Simon did so. The court agrees that the evidence demands the conclusion that Mell was Plaintiff's agent. However, Defendant's argument fails because it does not address the issue of scope of authority. Where criminal activity is allegedly involved, one may not assume that a person's agent is acting within the scope of his authority. *See Burnett v. Lewis*, 40 Ga. App. 525, 150 S.E. 462 (1929). Defendant had the burden of proof on this issue, and the evidence did not require a determination that Mell would have been acting within the scope of his authority if he told Swofford to sign the letter.

■ Defendant next argues that the evidence demands the conclusion that the alleged slander was not uttered with actual malice. At trial the court instructed the jury that there was no basis for any conclusion that Kujawski acted out of spite or ill will, as he did not know the Plaintiff and had no relationship to him nor any motive to impugn him. However, the court instructed the jury that under California law, Plaintiff could prove actual malice by a showing that Kujawski acted with reckless disregard for the truth or falsity of the statement made. Reckless disregard could be proven by a showing that Kujawski had serious doubts that the facts he was relating were true.

Plaintiff's argument is that actual malice was established because at trial, Kujawski stated that he knew Simon had not instructed Swofford to sign the letter. Kujawski in fact denied having said to Petroni that Simon had authorized Swofford to sign the letter. Thus, Plaintiff argues that Kujawski not only knew there was a high probability that the statement was false,

but had express knowledge that it was false.

The court finds, however, that this interpretation of Kujawski's testimony is not permissible given the factual context. The record is clear that Kujawski had only those facts which were furnished to him after the fact by persons involved in the transaction. The facts furnished to him were that Mell had authorized Swofford to sign the letter, and Mell was working for Simon. Thus, it is obvious that what Kujawski meant was that he knew Simon had not told Swofford to sign his name. However, Kujawski had no reason to think it probable, much less highly probable, that Mell was acting outside the scope of his authority in directing Swofford to sign Simon's name. Indeed, the other information which had been furnished to Kujawski confirmed that Mell had been acting *within* the scope of his authority. Kujawski had been told that when Simon was called about the so-called forged letter of authorization, he stated that Swofford had been authorized to sign his name. The record wholly fails to establish any basis for an argument that Kujawski doubted that Simon had confirmed Swofford's authorization to act for him. Therefore, in Kujawski's mind, the two different statements would have seemed the same. Accordingly, while Plaintiff's argument has some superficial appeal, it does not withstand analysis.

Finally, the court turns to Defendant's argument that the evidence provides no basis for a conclusion that the alleged slander was the proximate cause of Plaintiff's termination. While the court recognizes that issues of causation are normally reserved for the jury, it nonetheless finds that the evidence demands a conclusion which is the opposite of that reached by the jury.

■ Before turning to Defendant's argument that the alleged slander did not cause Simon's termination, the court wishes to acknowledge that under the evidence, the jury was entitled to conclude, which it obviously did, that Simon was not personally involved in a scheme to defraud Reynolds.

However, that determination alone is insufficient to sustain the judgment on the slander claim, as at least two of the issues raised by Defendant have no relationship to the question of Plaintiff's involvement or non-involvement in any fraud.

■ The evidence demands a finding that Simon's termination was not caused by the alleged slander, *i.e.*, that the slander was not a substantial factor in bringing about the termination. First, there is literally an absence of evidence that the specific comment alleged to be slanderous, "According to our broker, Swofford, Simon instructed him to sign the letter," was a factor when Reynolds terminated Plaintiff. Reynolds, whose testimony was of paramount importance in establishing what motivated him to terminate Simon, was never asked whether this statement was a factor. He did say that the call from Kujawski caused him to think that Simon was involved in criminal activity, but there was no way for the jury to isolate the impact of the alleged slander from the impact of the remaining nonslanderous portions of the telephone call, all of which placed Plaintiff in a very unfavorable light. The phone call correctly related that Reynolds' account, under Simon's leadership, had suffered from mismanagement and fraud; that documentary and other evidence existed suggesting that Mell and Bell, agents of Plaintiff, had been acting in concert with Shearson's broker to defraud Reynolds; that the broker had been caught trying to make payments from Reynolds' account to Simon and his relatives. These statements alone are suggestive of Simon's involvement in criminal activity.

Secondly, the alleged slander is an improbable reason for terminating Simon because it was a statement attributed to a source acknowledged to be questionable. Kujawski did not assert that Simon instructed Swofford to sign the letter, and he did not vouch for Swofford as a source. He made it clear that he was only relating what Swofford had said, and implied that Swofford was not trustworthy. Under these circumstances, it strains logic to

think that Reynolds would focus on this particular comment as a basis for terminating Simon.

Whatever vitality the attributed statement may have as an inferable basis for Simon's termination comes only from its relationship to other comments made by Kujawski at the same time. Specifically, Kujawski also said that (1) Simon had confirmed that Swofford signed the letter on his instructions and (2) pursuant to the letter, Swofford had sought to confer monetary benefits on Simon and his relatives. However, neither of these statements are actionable slander. The second statement is absolutely true. The first statement was made in good faith, because it had been reported to Kujawski that Simon had confirmed Swofford's authorization. Kujawski was entitled to relate both of these items to Petroni. The additional information concerning what Swofford had said was not a meaningful or significant addition to these facts.

Third, the considerable express testimony in the record explaining Reynolds' reasons for terminating Simon—the testimony of Reynolds, Gershenson, and Fimberg—identifies reasons other than the alleged slander as the reasons for Simon's termination. Reynolds explained that his primary reason was personality factors, and said that he had already determined that the relationship probably was going to end before the phone call. He did admit that his decision to terminate Simon had been made after the call.[11] When Reynolds was asked why he did not terminate Plaintiff right after the phone call, he stated that was on the advice of his attorney. Thus, Simon's termination did not come until after an investigation had been made, which turned up facts suggesting that (1) Simon had been quite negligent in overseeing Reynolds' account, and (2) Simon's agents had received money from Reynolds' account under circumstances that appeared highly questionable.

Plaintiff argues that what was learned later is of no consequence, because the jury

11. Reynolds did not say how long after the phone call this decision was made.

was entitled to infer that Reynolds made his decision as soon as he received the phone call. However, Reynolds did not say that, and he is a witness who had no incentive to give testimony biased toward either side. By the time his deposition was taken, he had severed his ties with both Shearson and Simon. The inference sought by Plaintiff—that Reynolds merely waited so as to gain Plaintiff's cooperation in the investigation—is only a speculative inference. Reynolds could just as well have meant that on advice of his attorney, he withheld his final decision to see what would turn up in the investigation.

Thus, the jury had before it an abundance of express testimony from unimpeached sources that failed to support Plaintiff's theory as to why he was terminated. Plaintiff's theory was supported only by slight speculative inferences and his own opinion. Under these circumstances, the jury's determination cannot stand.

### B. The Commodities Fraud Claim

Defendant argues it is entitled to judgment notwithstanding the verdict or alternatively, a new trial on Plaintiff's fraud claim growing out of the handling of his commodities account.

In the parties' post-trial briefs, Defendant states that Plaintiff's fraud claim is based on: (1) Swofford's alleged representation that losses could be capped at $10,000; [12] (2) Swofford's failure to disclose sufficiently the risks of options trading; (3) Swofford's misrepresentations that the account was profitable, when it was in a loss position; and (4) Swofford's failure to tell

Plaintiff that he had margined bonds in order to produce cash required to facilitate operation of the commodities account. Defendant argues that $40,997, which is the amount of actual damages awarded by the jury, is a demonstrably improper measure of damages with respect to any of the identified misrepresentations or omissions to disclose.

In response, Plaintiff states that his fraud claim is also based on Swofford's failure to disclose to Simon that he was not trading the commodities account for hedging purposes as Simon had instructed him to do, and the allegedly fraudulent transfer of $40,997 in funds from the securities account to the commodities account.[13] Plaintiff argues that $40,997 is a proper measure of damages, because if there had been no money transferred from Plaintiff's securities account to his commodities account, Plaintiff would have been unable to operate a commodities account and would have sustained no losses.

Before turning to examination of Defendant's motions, the court notes the following: First, the court agrees with Plaintiff that he did not execute an agreement reflecting an expectation that he would borrow money from the Defendant to facilitate transactions in the commodities account. The documents Plaintiff signed refer to various provisions which become effective when an account is operated on a margin basis, but no loan agreement was signed. Secondly, the Defendant nonetheless did extend credit to Plaintiff which was used for his benefit in the operation of

---

12. Both sides state that the court's ruling on Defendant's motion for directed verdict was confusing. The court stated it was dismissing Plaintiff's claim that he was defrauded because Defendant had represented that it had a computer that would limit his losses, when it did not have such a computer. The motion on this claim was granted because there was no evidence that such computer does not exist. The court retained for the jury's consideration, however, the claim that Swofford misrepresented that he could cap Plaintiff's losses at $10,000.

13. The pretrial order refers only to (1) Swofford's representation that he could cap Plaintiff's losses, (2) the fraudulent transfer of $40,997 from Simon's bond account to his commod-

ities account, and (3) Swofford's misrepresentation that profits had been made in the commodities account, when none had been made. Plaintiff's amended and restated complaint filed March 29, 1985, refers to Swofford's misrepresentation that Shearson had a computer which would reduce risks inherent in commodities trading, the misrepresentations of profits, and the misrepresentation that Swofford was experienced in commodities trading. The claim that Swofford omitted to disclose that he was not trading for hedging purposes was first made in response to Defendant's motion for directed verdict. None of the commodities claims were argued in the closing argument to the jury.

his commodities account. Third, as a result of that extension of credit, a lien presently encumbers Plaintiff's bonds which are still being held by Defendant. Fourth, there is no longer a debit balance in Plaintiff's commodities account because the net loss left after applying the $40,997 was written off by Defendant and was not sought to be collected in the instant litigation. Therefore, it "cost" Plaintiff $40,997 in essentially borrowed funds to trade commodities. Therefore, $40,997 represents the maximum award of actual damages that could be made on the commodities claims under any theory.

■ Turning to the motion for judgment notwithstanding the verdict, the court agrees with Defendant that $40,997 is not a proper measure of damages with respect to any of the acts or omissions urged to be the basis for liability. First, it would not represent a proper measure of damages with respect to the claim that Swofford misrepresented that he could cap losses at $10,000 because the damages do not reflect any offset for the $10,000 loss Swofford was authorized to incur. Secondly, as noted, the transfer of funds from the securities account to the commodities account did not cause the commodities account to incur losses. The losses were caused by the particular investment decisions which were made. Third, the evidence failed to prove that Simon made any decisions concerning the trading of his account in reliance on any representations of profits by Swofford. There were only two sets of transactions. The first yielded a profit; the second yielded the $54,638.10 loss. The record fails to show that Swofford misrepresented profits prior to the second set of transactions. Finally, although there was evidence that Swofford omitted to disclose that he was not operating the commodities account merely to hedge Simon's bond portfolio, but rather was operating it on a speculative basis, the evidence fails to quantify the extent to which the commodities trading exceeded legitimate hedging purposes. Clearly, Simon expected to undertake a degree of risk to hedge the bonds, even though Swofford's commodities trading exceeded that anticipated by Simon.

■ The court does find, however, that the jury could have determined that Simon sustained an injury when the commodities futures trading exceeded that authorized for hedging purposes. Thus, under the evidence the jury would have been entitled to award nominal damages on this theory. Accordingly, the court denies Defendant's motion for judgment notwithstanding the verdict.

■ The court does, however, grant Defendant's motion for a new trial. Defendant correctly argues that the court failed to charge the jury on the defenses of waiver, ratification and estoppel. This failure was prejudicial. Further, the court is satisfied that its failure to grant Defendant's request for a fuller charge on the element of justifiable reliance was error. Accordingly, Defendant's motion for a new trial on the fraud claims arising from the handling of the commodities account is hereby granted.

In summary, Defendant's motion for judgment notwithstanding the verdict on the slander claim is GRANTED; the court further, pursuant to Rule 50(c), Federal Rules of Civil Procedure, hereby conditionally GRANTS the Defendant a new trial on the slander claim, should the court's entry of judgment notwithstanding the verdict be reversed on appeal. The basis for granting a new trial is that the verdict on the slander claim is strongly and decidedly against the great weight of the evidence. Further, the damages awarded on that claim are excessive, and the special damages awarded are not supported by evidence.

With respect to the fraud claims arising out of the commodities account, the court hereby GRANTS Defendant's motion for a new trial for the reasons previously stated.

With respect to the court's order granting Defendant's motion for judgment notwithstanding the verdict on the slander claim, the court finds that as this claim is factually separable from the other claims, final judgment should be entered immediately. In that regard, the court finds that there is no just reason for delay and expressly DIRECTS the Clerk to enter judg-

ment in favor of the Defendant on the slander claim.