Alexander A. SIMON, Jr.,
Plaintiff–Appellant,
Cross–Appellee,

v.

SHEARSON LEHMAN BROTHERS,
INC., Michael W. Swofford,
Defendants–Appellees, Cross–Appellants.

No. 87–8718.

United States Court of Appeals,
Eleventh Circuit.

Feb. 20, 1990.

Charles E. Campbell, Peter J. Quist, Robert Tayloe Ross, Hicks, Maloof & Campbell, Atlanta, Ga., for plaintiff-appellant, cross-appellee.

Peter J. Anderson, Louise Bailey Matte, Sara Anne Ford, Peterson, Young, Self & Asselin, Atlanta, Ga., Scott Eugene Daniel, Hilburn, Calhoon, Harper & Pruniski, Ltd., North Little Rock, Ark., for defendants-appellees, cross-appellants.

Before HATCHETT and CLARK, Circuit Judges, and FITZPATRICK *, District Judge.

CLARK, Circuit Judge:

This appeal arises from the district court's grant of a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, following a three and a half week jury trial involving claims of negligence, fraud and defamation. 665 F.Supp. 1555 (N.D.Ga.1987).

The complaint, filed by Alexander A. Simon Jr., (Simon), originally named as defendants Shearson Lehman Brothers, Inc., (Shearson), and certain of its employees: Michael W. Swofford, (Swofford), Peter T. Kujawski, (Kujawski), and Joseph Del Duca, (Del Duca). Pursuant to agreement, all defendants except Shearson and Swofford were eventually dismissed. Before trial, Shearson asserted counterclaims against Simon arising out of an alleged assignment of claims from the movie actor Burt Reynolds, (Reynolds).

Trial was held in the Northern District of Georgia in April and May of 1987. During the course of the trial the district court entered directed verdicts against both Simon and Shearson for all claims except Simon's claims of negligence, fraud and slander. The jury returned a verdict as follows: On the negligence claim arising out of the handling of Simon's commodities account, the jury found for Simon in the amount of $25,000.00; on the fraud claim based on willful misrepresentations made by a Shearson employee in the handling of Simon's commodities account, the jury found for Simon in the amount of $40,-997.00 actual damages and $3,000,000.00 punitive damages; and on the slander claim, the jury found for Simon in the amount of $1,000,000.00, special damages, $1,000,000.00 general damages, and $5,000,000.00 punitive damages. Simon was forced to elect either the negligence award or the fraud award because they were duplicative awards based on alternate theories for the same harm, and along with

the slander award, judgment was subsequently entered for Simon in the amount of $10,040,997.00.

In an order filed August 5, 1987 (Order), the district court granted Shearson's motion for a JNOV, and for a conditional new trial on Simon's slander claim. On Simon's fraud claim, the court denied Shearson's motion for a JNOV but granted its motion for a new trial and this issue has not been appealed. Simon filed notice that he was appealing the slander claim and Shearson subsequently filed a cross-appeal. The slander arose in a conversation between a Shearson official and Reynolds' attorney in which the official relayed false information that the jury found caused Simon's termination as Reynolds' business manager. We affirm the district court's grant of a JNOV as to the award of special damages but reverse the district court's JNOV as to general and punitive damages. Although the evidence supports a general and punitive damages award, we find that the amounts awarded by the jury in this case were excessive as a matter of law. We therefore grant Shearson's motion for a new trial on the question of general and punitive damages unless Simon agrees to a remittitur. Finally, we affirm the district court's directed verdict on Shearson's counterclaims.

## BACKGROUND

In December 1982, Simon, a resident of Boynton Beach, Florida, met with Reynolds, a part-time resident of Jupiter, Florida. Reynolds was looking for a business manager and Reynolds and Simon eventually agreed that Simon would handle Reynolds' financial affairs and personal investments. (SR. 274–86).[1] Simon and Reynolds executed a written contract, which set out a percentage basis for Simon's compensation. (SR. 286–87). This percentage was originally set at 5% of Reynolds' annual acting and directing revenues and, although Simon's compensation

---

* Honorable Duross Fitzpatrick, U.S. District Judge for the Middle District of Georgia, sitting by designation.

1. All reference to the supplemental record are abbreviated "SR." followed by one or more page numbers.

did not include a percentage of Reynolds' annual investment revenue, Simon's compensation percentage was raised to 7% in 1983. (SR. 1634). The employment contract was to expire on December 1, 1984, with Reynolds and Simon both having the right thereafter to terminate the relationship on not less than thirty days written notice. (J.Ex. 1; J.EX. 3). Simon developed a five-year financial plan for Reynolds which Reynolds endorsed, (SR. 298–302), and sometime in the spring of 1983, Reynolds gave Simon a general power of attorney. (SR. 326).

In May, 1983, Simon opened accounts for both himself and Reynolds with Shearson at its Little Rock office. Simon chose this branch office on the advice of accountant Labe Mell, (Mell), a partner of Simon's personal accountant in Atlanta, Keith Bell, (Bell). The Shearson broker handling the account was Michael Swofford. (SR. 320–25).

Mell began working with Swofford in 1983. Evidence shows that soon after Swofford began to buy and sell bonds for Reynolds in consultation with Mell, Swofford began making payments to Mell and Mell's partner, Bell. These payments were in an amount equal to one half of Swofford's commissions on the Reynolds transactions. (SR. 2769–82; 2360–62; 953–54). Nonetheless, both Mell and Bell denied that they were splitting commissions with Swofford; they testified instead that they believed the payments were made in consideration of tax advice that they provided. (SR. 1933–45; 2319–24; 2341–45). During 1983 and the first half of 1984, Swofford also embezzled money from the Reynolds account.[2] (SR. 2827). Both Mell and Bell adamantly deny that they were involved in any way with Swofford's embezzlements, despite the fact that Swofford and other evidence implicated them in the scheme. (SR. 956–68; 989–90; 2153; 2163–73; 2797–822).

In August, 1984, Simon, on Swofford's advice, opened commodities accounts for himself and Reynolds. (SR. 344; 372–76). Although these accounts suffered substantial losses, Swofford reported gains to Simon (SR. 368–72), and Simon eventually directed Swofford to open commodities accounts for various friends and relatives. Swofford never opened these accounts but began reporting fictitious gains in them as well.[3] (SR. 939–40). Although Simon received a statement that his account had lost money, Swofford assured Simon that these reported losses were computer or technical mistakes and that the accounts were actually operating at a profit. (SR. 370; 1861; 461).

On October 4, 1984 Simon and Swofford met concerning these accounts and Simon allegedly instructed Swofford to close all of the commodities accounts, including Reynolds'. (SR. 367–69). According to Simon, a cat and mouse game ensued over the next five weeks with Simon attempting to obtain the "profits" from the closed commodities accounts and with Swofford dodging and explaining the delays and conflicting paperwork at every turn. In addition, discrepancies appeared in the paperwork for Reynolds' other account at the Little Rock office.

Nothing in the record reflects that as of October, 1984, Reynolds had any specific concerns about the handling of the Shearson account or about Simon's handling of Reynolds' investments in general. Nonetheless, at the advice of his publicist, David Gershenson, Reynolds initiated a legal audit of Simon. Evidence also showed that Reynolds and others associated with Reynolds were dissatisfied with Simon's attitude; several people involved in Reynolds' affairs reported personality conflicts. (SR. 646–47; 1597–1619; 2422–33).

On October 9, 1984, Swofford, pressured to send Simon profits that he had orally reported to be in the various commodities accounts, caused Shearson checks to be

---

**2.** Swofford has admitted to this crime and is currently under a federal sentence. (SR. 2752–53).

**3.** Because Simon never sent any money for these accounts, there is some confusion as to how they were to be opened. The dispute over whether the accounts were cash or margin is irrelevant to this appeal.

prepared payable to Reynolds and to those of Simon's friends, relatives, and associates who supposedly had commodities accounts at the Little Rock office. All of the checks were to be paid out of funds in Reynolds' account for which Simon held the power of attorney. Swofford presented the Shearson bank with a letter authorizing this disbursements of funds; this letter of authorization, (forged LOA), was signed "Alexander Simon." (J.Ex. 92). Branch personnel questioned Simon's signature on the letter as it did not appear genuine. Swofford initially claimed that the signature was Simon's; when pressed, however, Swofford admitted that he had forged Simon's name, but claimed that Labe Mell instructed him to do so because the authentic LOA had been delayed. (SR. 1413–14; 1495–96; 2887–88).

The events of the next several days are unclear. Either one or two phone calls were made but the substance of the call or calls is disputed. Shearson claims that its Little Rock branch manager called Simon, that Simon confirmed his knowledge of the forged LOA and that Simon promised to send a new LOA immediately. (SR. 1431–32; 1534–38). According to Shearson, the branch manager later reported Simon's alleged knowledge of the forged LOA and the arrival of the second LOA to Shearson's chief deputy counsel, Kujawski. (SR. 1329; 3192–93).

Simon claims that the branch manager telephoned him twice; in neither conversation did the manager inform Simon of the forged LOA. Rather, the manager merely inquired, in general terms, into how the accounts were doing in order to find out how much Simon knew about the status of Reynolds' account. Simon further testified that he was still attempting to get the "profits" from the commodities accounts and that he informed the manager that he was going to send a letter authorizing named agents, (Keith Bell, Labe Mell and James Malte), to receive the bonds and cash proceeds on his behalf (second LOA). (SR. 385–88). The Little Rock office received this second LOA a few days later and there is no dispute that it did not

authorize any payments out of Reynolds' account. (SR. 1106–08; 1447–48).

On October 18, 1984, $201,000.00 was wired from Reynolds' Shearson account to Simon's personal account in Florida. (SR. 684–85; 701). Malte testified that this transfer occurred after a call from Shearson requesting instructions for sending commodities profits to Reynolds, Simon and Eassa Properties. Malte testified that he gave Shearson both Reynolds' and Simon's account numbers. (SR. 839–41). The wire for the transfer bore Reynolds' name but Simon's account number. Simon testified that he did not know the money was transferred from Reynolds' account; rather, he was under the impression that the transfer constituted part of his commodities profits. (SR. 378).

By coincidence, Simon's power of attorney was either orally suspended or orally revoked on October 22, 1984. (SR. 665). The revocation was precipitated not by any suspicion of Simon but rather by an independent determination by Reynolds and some of his advisors that it was imprudent for anyone other than Reynolds to wield such a power (SR. 1588–89). At this point neither Reynolds nor the attorneys conducting Simon's legal audit were aware of any irregularities in Reynolds' accounts. (SR. 1626).

Over the next several days, several Shearson officials, including Kujawski, met separately with Swofford and Mell concerning Reynolds' Shearson account. First, the Shearson officials met with Swofford who told them of the commission splitting and told them that Simon knew of the arrangement. (SR. 1010–18; 2903). The evidence conflicts as to what else was discussed at this meeting. Swofford first testified by deposition that he also told the officials about the money he embezzled from Reynolds' Shearson account, indicating to them that wire transfers had been sent from Reynolds' account to Swofford's account and that some of the funds were then disbursed to Mell and Bell. (SR. 1012–13). Swofford also testified that at this meeting he did not implicate Simon in these embezzlements but rather he specifically told the

Shearson officials that efforts were made to keep Simon from discovering any wrongdoing. (SR. 1015–17).

Swofford later completely contradicted his deposition testimony. During trial he testified that at the meeting with Shearson officials he did not disclose that he had embezzled funds, but rather he only elusively discussed the fact that funds had been wired out of Reynolds' account:

Swofford: I told them that I had talked to an attorney, that I had been receiving funds from Mr. Reynolds and, in fact, disbursing those funds. I said I had been acting, you know, as an escrow agent and retaining a commission for performing those services.

Attorney: What did you tell them with respect to the wire transfers to the NBG account?

Swofford: I told them that those were— that the NBG account was a Reynolds account.

Attorney: And then at some point you told them you were disbursing funds?

Swofford: That's correct.

Attorney: Who did you tell them was sending you these funds?

Swofford: I told them that they were coming from the money advisers or money managers in Mr. Reynolds' account.

\* \* \* \* \* \*

Attorney: Did you make a full and complete disclosure to the Shearson people at the Packett House meeting?

Swofford: No, I did not.

Attorney: Did you tell them that any money from Mr. Reynolds' account had been stolen?

Swofford: I did not.

Attorney: Did you tell them that you were stealing money and dividing it between yourself and Mr. Mell and Mr. Bell?

Swofford: No. I did not.

(SR. 2902–04). Swofford also testified that he said nothing that would have exonerated Simon from an implication of wrongdoing in connection with the embezzlement. (SR. 2921–22).

The next day, the Shearson officials met with Mell who denied that he received any percentage of commissions and denied any responsibility for the problems with the Reynolds account. At this meeting, Mell was shown a copy of the forged LOA, (SR. 1867–68; 2096), but a dispute exists over whether the Shearson officials expected Mell to report the existence of the forged LOA to Simon. (SR. 1867–72; 2085–86; 2104). Shearson claims that it actually gave Mell a copy of the forged LOA and that Mell stated that he would report everything "to the group that sent him." (SR. 1370–72). Mell testified that he was merely shown a copy of the forged LOA and that Shearson misled him into believing that Simon already knew about the forged LOA and that, as a result, it was unnecessary to alert Simon to the forgery. (SR. 2085–86).

On November 9, 1984, Kujawski decided to inform Reynolds of the irregularities in Reynolds' Shearson account, and he called Donald Petroni, Reynolds' attorney. From Petroni's testimony and his notes of the phone call, it appears that in reporting the events connected with Reynolds' Shearson account, Kujawski informed Petroni that Sandy Simon had authorized the forged LOA which called for disbursements out of Reynolds' account to various individuals including Simon's associates and relatives. (SR. 786–89). Kujawski denied that he ever made such a statement. After the telephone conversation, Petroni called Reynolds and spoke with him, but Petroni, asserting the attorney-client privilege, has refused to divulge the substance of that conversation. (SR. 795–96).

Simon testified that after the Kujawski phone call, his relationship with Reynolds deteriorated. He claims that Reynolds only spoke to him once after the call: the day after the Kujawski telephone call to Petroni, Reynolds telephoned Simon and communicated his disappointment, accusing Simon of stealing money from his account. (SR. 404–05). Reynolds cannot recall this conversation. (SR. 1601). Simon also testified that he returned the $201,000.00 in his account that was Reynolds' as soon as the

error was discovered. (SR. 696). Simon claims that he was no longer able to perform his function as a business manager because he could not cut any checks and had to have transactions preapproved (SR. 409–10). Shearson, however, claims that the evidence shows that the date of Kujawski's phone call was not the critical date concerning Simon's restrictions. (SR. 640; 664–66). Instead, the restrictions were the result of Reynolds' increasing loss of trust in Simon resulting from personality problems and mismanagement.

On November 16, 1984, Simon's power of attorney was formally revoked in writing. (SR. 704). In mid-November, Stanley Fimberg, a friend of Reynolds' publicist, Gershenson, met with Reynolds and agreed to conduct an investigation into all of Reynolds' affairs. (SR. 1579; 1617; 1654). A few days later, Fimberg flew to Florida to meet with Simon. After meeting with Simon, Fimberg told Reynolds he disagreed with how Simon's deals were structured. (SR. 2683–84). Reynolds testified Fimberg told him "things were in disarray" and "sloppy." (SR. 1617). At some point, Fimberg also told Reynolds that Simon's management of Reynolds' Shearson account was not consistent with Reynolds' best interests. Too much money had gone beyond Simon's control and the supervision was not what it should have been. (SR. 2704–05). On December 6, 1984, Simon received a letter terminating him as Reynolds' business manager effective December 31, 1984. (SR. 637). Fimberg told Simon that he was being terminated because Reynolds had lost trust in him. (SR. 639; 2715).

## DISCUSSION

### I. Standard of Review

█ In reviewing the district court's grant of a JNOV, our standard of review is the same as that used by the district court to determine whether to grant a JNOV in the first instance. As we stated in *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1558 (11th Cir.1988):

All of the evidence presented at trial must be considered "in the light and with all reasonable inferences most favorable to the party opposed to the motion." A motion for judgment n.o.v. should be granted only where "reasonable [people] could not arrive at a contrary verdict...." Where substantial conflicting evidence is presented such that reasonable people "in the exercise of impartial judgment might reach different conclusion, [sic]" the motion should be denied. (Citations omitted).

█ Furthermore, the district court conditionally granted a new trial on Simon's slander claim because it found the jury verdict against the great weight of the evidence, the damages award excessive and the special damages award unsupported by evidence. In reviewing the grant of a new trial, we generally attempt to determine whether the district court abused its discretion. The general "abuse of discretion" standard used to review the grant of new trials, however, is subject to different gradations of strictness depending upon the reasons that the district court gives for granting the new trial.

Where the grant is on the ground that the verdict is against the weight of the evidence, we exercise close scrutiny out of deference to the right of the litigant to have a jury determination of the facts.... [Our review is also] more strict ... when the issues are simple and the outcome largely dependent on the credibility of witnesses.

*Deas v. Paccar, Inc.*, 775 F.2d 1498, 1503–04 (11th Cir.1985), *cert. denied*, 475 U.S. 1129, 106 S.Ct. 1658, 90 L.Ed.2d 201 (1986) (citations omitted).

Finally, when the district court grants a new trial because it finds the jury award "excessive," we employ the general abuse of discretion standard. While "[i]t is true that a grossly excessive award may warrant a finding that the jury's verdict was swayed by passion and prejudice ... thus necessitat[ing] a new trial, ... a new trial should only be ordered where the verdict is so excessive as to shock the conscience of the court. Whether a new trial is required is within the sound discretion of the district court...." *Goldstein v. Manhattan In-*

*dustries, Inc.,* 758 F.2d 1435, 1447 (11th Cir.), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 525, 88 L.Ed.2d 457 (1985) (citations omitted). With these standards in mind, we turn to the merits of this appeal.

## II. Elements for Simon to Prove

As a preliminary matter, we must address the question of whether Kujawski's statement, "[a] Shearson employee says, however, that he signed Sandy Simon's signature to that letter, but he said he signed it on Sandy Simon's instructions," is slander *per se.*[4] In determining this question, we are guided by California law because, in this diversity case, Georgia law requires us to apply the law of the state in which the tort occurred. *Wallace v. Harrison,* 166 Ga.App. 461, 462–63, 304 S.E.2d 487, 489 (1983). Under defamation law, a slander occurs wherever the allegedly defamatory remark was published. *Cf. Stepanian v. Addis,* 782 F.2d 902 (11th Cir.1986) (where material published in Florida, plaintiff could maintain cause of action under Florida law).

Under California law, a plaintiff may recover general and punitive damages without pleading or proving that the plaintiff suffered any special damages if the statement at issue is slander *per se.* Conversely, if a statement is not slander *per se,* a plaintiff must prove special damages before any general or punitive damages may be collected. *White v. Valenta,* 234 Cal. App.2d 243, 44 Cal.Rptr. 241 (1965). Simply because a statement is slander *per se,* however, does not mean that a plaintiff *cannot* plead and prove special damages. *See Stevenson v. Hearst Consolidated Publications, Inc.,* 214 F.2d 902, 906 (2d Cir.), *cert. denied,* 348 U.S. 874, 75 S.Ct. 110, 99 L.Ed. 688 (1954). Special damage is "the loss of something having economic or pecuniary value," *Restatement* 2d *Torts* § 575, comment b, while general damages

include "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 3013, 41 L.Ed.2d 789 (1974).

The California Code defines slander *per se,* in pertinent part, as a statement that

> charges any person with crime, ... [or] tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualifications in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits; ...

Cal.Civ.Code § 46. Thus, a statement is *slander per se* if it charges a person with crime or directly injures a person's professional reputation. In addition, charging a person with some general undesirable characteristic is not actionable as slander *per se* if it does not directly "touch the plaintiff in his [or her] office, profession or trade." L. Eldredge, *The Law of Defamation,* § 22 at 127 (1978).

The district court held the statement made by Kujawski was not slander *per se* because, on its face, it did not impute a crime to Simon. (SR. 3261). Simon contends that the district court erred in holding that, as a matter of law, the challenged remark was not slander *per se.* Simon argues that Kujawski's remark imputes criminality or is damaging to Simon's business reputation. At the very least, Simon argues, the remark is susceptible of both a defamatory and an innocent interpretation and as such, the question of whether the remark is *slander per se* should have been submitted to the jury. We agree with Simon that, considering extrinsic evidence, the remark is one that would tend to direct-

---

4. We grant Shearson's motion to strike Simon's argument that Shearson made six slanderous statements and that all of these statements were *slander per se.* From the filing of the complaint and throughout the post-trial briefs, the alleged slander has been limited to only one statement: that Swofford said that Simon authorized the letter allowing disbursement of Reynolds' funds.

During trial, Simon did not object to the jury charge which concerned only the one statement and he did not argue to the jury that more than one slanderous statement was made. Simon cannot argue for the first time on appeal that other statements made during Kujawski's phone conversation with Petroni were also slanderous.

ly injure him in his profession. We also find that the district court erred in holding that, under California law, the remark is not slander *per se* because it required reference to extrinsic facts to prove its defamatory meaning.

The understandable confusion in this area stems from the different developments, in some jurisdictions, of *"per se"* defamation in the context of libel and slander. In the law of slander, *"per se"* refers to certain categories of defamation such as that charging a person with a crime, that charging a person with an infectious disease, that charging a person with unfitness for his or her profession and that charging a woman with unchastity. In contrast, in the law of libel, *"per se"* has taken on a separate meaning and refers to a statement that is understood as defamatory without resort to extrinsic fact. R. Smolla, *The Law of Defamation*, § 7.06[3] (1986). Although some jurisdictions have blurred the distinction between libel *per se* and slander *per se*, (see, for example, New York law), California has retained the separate classifications. *See White*, 44 Cal. Rptr. at 246–47 (unlike libel, an allegedly slanderous remark is actionable without proof of special damages if, by way of innuendo and inducement, remarks are fairly susceptible of defamatory meaning). Thus, the district court erred in holding that Kujawski's statement was not slander *per se* because "in order to determine whether the language was defamatory, it is necessary to look at the facts and circumstances that are a good bit outside the language itself." (SR. 3261). This holding mistakenly focuses on the difference between libel *per se* and libel *per quod* rather than focusing on the difference between slander *per se* and slander *per quod*.

■ In determining whether a statement is slander *per se* under California law, the question is not whether extrinsic evidence is needed to prove the statement's defamatory meaning but rather whether the statement, if understood in its defamatory sense, would fall within one of the categories enumerated in the California slander statute. In other words, a statement is slander *per se* if, in looking at the circumstances of the publication, including extrinsic evidence, the potentially defamatory statement accuses someone of a crime, accuses someone of unfitness for his or her profession, accuses someone of having an infectious disease or accuses a woman of being unchaste. If the slanderous statement does not fall within one of these categories, the statement is slander *per quod* and requires proof of special damages even if the statement is facially defamatory.

> Thus, it is slander *per se* to say of the plaintiff that he murdered his mother but only slander *per quod* to say that the mother's death from a sudden heart attack is all that saved her from being murdered by the plaintiff on her birthday, a fortnight later, because he had planned to bake her a birthday cake containing lethal quantities of arsenic.... The distinction is that in the first case the plaintiff is accused of having committed a serious crime; in the second, no crime is charged.

L. Eldredge, *The Law of Defamation*, § 18 at 94–95. Once the court determines that a statement is capable of a defamatory meaning, the issue is submitted to the jury to decide whether, in fact, the statement was understood as such. *See MacLeod v. Tribune Publishing Co.*, 52 Cal.2d 536, 548–49, 343 P.2d 36, 43 (1959).

■ On the one hand, we agree with the district court that Kujawski's statement does not impute a crime to Simon. Looking at the surrounding facts, the statement alleges that Simon gave his authorization for a letter that would have illicitly released certain of Reynolds' funds, but that ultimately, the letter never accomplished its purpose. Thus, the statement does not actually impute a crime; instead it insinuates that Simon had the intent to steal or embezzle funds. Although distinguishing between charging one with a crime and charging one with criminal characteristics is meaningless in a practical sense, it retains importance in slander law. "There is no sound reason for the distinction, there is only a historical explanation for it." L. Eldredge, *The Law of Defamation*, § 18 at

95 (explaining how distinction developed in England as jurisdictional tool).

On the other hand, we cannot say that the challenged statement could not be understood as imputing to Simon disqualifications in those respects necessary for his position. Kujawski's statement imputes both dishonesty and infidelity by implying that Simon attempted to abuse his authority and his power of attorney in connection with his position as the manager of Reynolds' affairs. Honesty and loyalty are certainly necessary qualifications for a fiduciary position such as the one held by Simon. Thus, the challenged statement is slander *per se* and Simon was not required to plead or prove special damages. The fact that the district court imposed such a requirement on Simon is not fatal, however, because the jury found that Simon did prove special damages and awarded him one million dollars for this loss. Therefore, if sufficient evidence exists to uphold the special damages award and the total damages awarded are not excessive, the verdict must be reinstated. If, however, the evidence does not support an award for special damages, Simon is still entitled to the general and punitive damages awarded, as long as these awards are supported by the evidence and are not excessive.

In sum, in order to prevail in this suit, Simon was required to prove that Shearson made the challenged statement and that the statement was defamatory. In addition, because the allegedly slanderous remark was conditionally privileged,[5] Simon was also required to prove actual malice. Finally, because of the posture of this case, we must also determine whether Simon proved that the statement caused special damages;[6] that is, whether the statement was a legal cause of Simon's termination.

### III. Judgment Notwithstanding the Verdict

In granting Shearson's motion for a JNOV, the district court held that the evidence supported the jury's finding that Shearson actually made the allegedly slanderous statement (Order 665 F.Supp. at 1572). The district court also implicitly found that the statement was understood in its defamatory sense. (Order at 1573). Nonetheless, the district court found that the jury verdict could not stand for two reasons. First, the court held that Simon did not prove that Kujawski acted with actual malice. Second, the court held that Simon did not show causation.

### A. *Actual Malice*

■ California law provides a conditional privilege for communications made "without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent...." Cal.Civ. Code § 47, subd. 3. Both Kujawski and, as Reynolds' attorney, Petroni, had a legitimate business interest in Shearson's allegedly defamatory communication. Thus, Kujawski's publication was conditionally privileged and Simon was required to prove actual malice in order to render the privilege inapplicable. *Roemer v. Retail Credit Co.*, 3 Cal.App.3d 368, 371, 83 Cal.Rptr. 540, 542 (1970).

The district court charged the jury that it could find actual malice if it found that Kujawski published a defamatory statement in reckless disregard for its truth or falsity; that is, with a high degree of awareness of the probable falsity of the statement or with serious doubt as to its

---

**5.** We reject Shearson's belated attempt to claim that Kujawski's statement was absolutely privileged as made "in contemplation of litigation." The district court excluded the argument as untimely because Shearson failed to raise this affirmative defense in its Answer, in the Pre-trial Order or during discovery. Under these circumstances, the district court did not abuse its discretion in excluding this defense. *Cf. Loughan v. Firestone Tire and Rubber Co.*, 749 F.2d 1519, 1526 (11th Cir.1985) (district courts have wide discretion in ruling on trial matters of this kind and will be reversed only for abuse of such discretion).

**6.** In this opinion, we use the term special damages to denote both the actual economic *harm* caused by the slander (*i.e.*, the loss of a job), and the actual pecuniary damage resulting from the special harm (*i.e.*, the specific income lost because of the economic harm).

truth. (SR. 3351). *See also, Gomes v. Fried,* 136 Cal.App.3d 924, 934, 186 Cal. Rptr. 605, 610–11 (1982). Because Kujawski's statement does not implicate the first amendment, Simon need only prove actual malice by a "preponderance of the evidence." *Roemer v. Retail Credit Co.,* 44 Cal.App.3d 926, 933, 119 Cal.Rptr. 82, 86 (1975).

The alleged slander at issue is Kujawski's statement, "[t]hese checks were to be issued pursuant to a letter from Sandy Simon to Shearson. A Shearson employee says, however, that he signed Sandy Simon's signature to that letter, but he said he signed it on Sandy Simon's instructions." This statement is reflected in Petroni's notes of the phone call which are set out in full in an appendix to this opinion. Because these notes were admitted into evidence, the district court found that it was permissible for the jury to rely, as it did, on these notes as an accurate reflection of what was said during the phone conversation; thus we also accept that the statements as written in Petroni's notes accurately reflect Kujawski's side of the phone conversation.

At trial, Simon offered Kujawski's deposition testimony to the effect that Kujawski *knew* when he made the phone call to Petroni that Simon had not authorized the forged letter.

Attorney: Do you recall telling Mr. Petroni the part that Mr. Swofford said he signed it on Sandy Simon's instructions?

Kujawski: No.

Attorney: You don't believe you told him that?

Kujawski: No, because he didn't sign it on Sandy Simon's instructions. I know he didn't sign it on Sandy Simon's instructions.

Attorney: No, but my question was can you state here and now that you did not tell Mr. Petroni that?

Kujawski: Yes, because it's not the facts as I knew them, nor would I have told him a fact that I didn't know.

(SR. 3192).

The district court rejected this testimony as evidencing actual malice due to the fac-

tual context in which the deposition testimony was given. The court held that Kujawski knew only what he was told by the branch manager: that Mell had authorized Swofford to sign the letter and that Mell was working for Simon. Thus, the court reasoned that when Kujawski testified that he knew that Simon had not authorized the letter, Kujawski really meant that he knew that Simon had not *directly* authorized the letter; rather, Kujawski's remark effectively reflected what he knew: that Mell had authorized the letter and that Simon later ratified that authority.

The main problem with the district court's analysis is that it makes an inference unfavorable to Simon. To state what Kujawski undoubtedly meant in order to explain away evidence favorable to the winning party is to draw an adverse inference inappropriate on a post-trial motion. *Rosenfield v. Wellington Leisure Products, Inc.,* 827 F.2d 1493, 1497 (11th Cir.1987). Kujawski testified that he did not tell Petroni that Swofford said that Simon authorized the forged LOA or that Mell or any other "agent" of Simon authorized the forged letter because that was not part of his consciousness. (SR. 1334–35). It is hard to imagine that Kujawski was incapable of articulating what he was actually conveying in his statement to Petroni or what he actually meant to convey. The jury was free to infer from Kujawski's testimony, that when Kujawski told Petroni that Swofford said that Simon had authorized the letter, Kujawski was speaking with a high degree of awareness that his statement was inaccurate.

Furthermore, in its order, the district court earlier rejects the idea that Kujawski's remark is true in essence because Kujawski was not free to assume that, because Mell was Simon's agent when Swofford stated that Mell authorized the letter, such a statement was the equivalent of stating that Simon authorized the letter. The court held that "[w]here criminal activity is allegedly involved, one may not assume that a person's agent is acting within

the scope of the agent's authority." Order 665 F.Supp. at 1572. For the court to then turn around and state "Kujawski had no reason to think it probable, much less highly probable, that Mell was acting outside the scope of his authority in directing Swofford to sign Simon's name," Order at 1572, is a contradiction. If Kujawski truly thought that Simon had ratified the letter, he could have so explained at trial. Instead, Kujawski simply denied that he ever made the slanderous remark. The jury was free to disregard this denial.

Without explanation, Kujawski's statement is highly suspect even in light of the information that Kujawski obtained through his branch manager. The district court's conclusion that there was no difference in Kujawski's mind between stating that Mell authorized the letter or that Simon authorized the letter invades the province of the jury. We hold that there was sufficient evidence for the jury to find that Simon showed by a preponderance of the evidence that Kujawski acted with reckless disregard for the truth or falsity of the facts contained in his allegedly slanderous remark.

### B. *Causation*

■ The district court also overturned the jury verdict because it found that the evidence did not support a finding that the challenged statement proximately caused Simon's termination. The issue of causation is the most difficult issue of this case. As stated earlier, we must look at *all* of the evidence presented at trial and, making all reasonable inferences most favorable to Simon, determine whether reasonable people in the exercise of impartial judgment could reach the verdict that the jury reached in this case. In this regard, the district court stated:

> the evidence [presented at trial] demands a finding that Simon's termination was not caused by the alleged slander, *i.e.*, that the slander was not a substantial factor in bringing about the termination.

First, there is literally an absence of evidence that the specific comment alleged to be slanderous, "According to our broker, Swofford, Simon instructed him to sign the letter," was a factor when Reynolds terminated the Plaintiff. Reynolds, whose testimony was of paramount importance in establishing what motivated him to terminate Simon, was never asked whether this statement was a factor. He did say that the call from Kujawski caused him to think that Simon was involved in criminal activity, but there was no way for the jury to isolate the impact of the alleged slander from the impact of the remaining nonslanderous portions of the telephone call, all of which placed Plaintiff in a very unfavorable light.... [The nonslanderous] statements alone are suggestive of Simon's involvement in criminal activity.

Order at 1573. The court further supported its finding that the alleged slander was an improbable reason for the termination by asserting that the alleged slander was a statement attributable to Swofford, a questionable source; and, that express evidence indicated that Reynolds terminated Simon primarily for personality factors.

Although the question is a close one, we disagree that the slanderous statement did not implicate more than that conveyed by the rest of the Kujawski phone call. As pointed out by the district court, without the slanderous statement, the phone call relates that "Reynolds' account, under Simon's leadership, had suffered from mismanagement and fraud; that documentary and other evidence existed suggesting that Mell and Bell, agents of the Plaintiff, had been acting in concert with Shearson's broker to defraud Reynolds; [and] that the broker had been caught trying to make payments to Simon['s] relatives." [7] Order at 1573.

We disagree with the district court that this information alone suggests Simon's involvement in criminal activity. Rather, we find that the above statements implicate that Simon was, perhaps grossly, misman-

---

7. The district court actually states that the phone call relates that Swofford attempted to make payments to Simon; this is technically not true. The call only related that Simon was a possible payee; however, no one ever attempted to issue a check in his name.

aging Reynolds' accounts. The slanderous statement that "according to Swofford, Simon instructed him to sign the letter," is the only statement in the phone call that directly implicates Simon in the fraud and *directly* imputes dishonesty, (as opposed to negligence), to Simon. While the other statements, taken alone, do place Simon in "a very unfavorable light," only the slanderous remark charges Simon with direct involvement in the perpetrated frauds by depicting Simon as *part* of the alleged illegalities. Thus, it was permissible for the jury to conclude that the slanderous remark was the major impetus that aroused Reynolds' suspicions as to Simon's participation in criminal activity. *See e.g., Sharon v. Time, Inc.*, 575 F.Supp. 1162 (S.D.N.Y.1983) (while unchallenged facts in magazine article accusing the former Israeli Minister of Defense of mistake and blunder severely affected the Minister's reputation as a military and political leader, challenged "fact" in same article, which further implied criminality or immorality, had potential for more serious impact on the Minister's reputation so that challenged fact was actionable libel).

The more important question, however, is whether the evidence supports the finding that the slanderous statement was a legal cause of Simon's termination. As a preliminary matter, we note that because Simon did not allege that the overall import of the conversation was defamatory, we must separate the challenged statement from the rest of the statements in the phone call. *Compare Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.*, 708 F.2d 944 (5th Cir.1983) (although all statements in article were true in isolation, cause for defamation existed where juxtaposition of statements resulted in overall defamatory meaning) *with Simmons Ford, Inc. v. Consumers Union of the United States, Inc.*, 516 F.Supp. 742 (S.D.N.Y.1981) (no defamation where challenged statement in article could not harm the plaintiff's reputation in anyway beyond the harm already caused by the unchallenged remainder of the article). Thus, the district court was correct in attempting to discern the impact of the challenged statement from the impact of the remaining unchallenged portions of the phone call.

Legal causation requires a finding that the slanderous statement was both a factual cause and a proximate cause of Simon's termination. Issues of causation are problematic and, under most circumstances, should be left to the jury. *See A.D. Luster v. Retail Credit Co.*, 575 F.2d 609, 614 (8th Cir.1978). In the context of intentional torts, a rough test for the inquiry into factual and proximate causation is whether the conduct was a substantial factor in bringing about the harm and "whether, by hindsight, it appears extraordinary that the conduct should have brought about the harm." In other words, "[i]s the relationship between the intentional interference and the unintended harm one of coincidence?" R. Keeton, *Legal Cause in the Law of Torts*, 102 (1983). Although helpful, this common sense approach becomes nebulous in borderline cases such as the one at bar. *See id.* For example in *Stevenson v. Hearst Consolidated Publications, Inc.*, 214 F.2d 902 (2d Cir.), *cert. denied*, 348 U.S. 874, 75 S.Ct. 110, 99 L.Ed. 688 (1954), the court held that although the plaintiff had lived indiscreetly for quite some time, the evidence supported a finding that a newspaper article, charging the plaintiff with having an illicit affair, proximately caused the plaintiff's termination.

> True, there was evidence of belief that "[the plaintiff's] personal conduct had been such that he had lost the respect of the organization generally." ... But not until the publication occurred charging something more serious than unconventional conduct did the company take action to his hurt. Whether the corporate officers themselves believed the defamatory imputation is immaterial if—as they testify—they took action because of the plaintiff's resulting loss of repute in the eyes of the personnel generally.

*Id.* at 907. Thus, the lesson from *Stevenson* is that the focus of causation is not what other factors could have played a role in the ultimate loss, but rather whether the evidence allows a finding that the def-

amation in question "produce[d] or contribute[d] substantially to the loss," regardless of whether the harm would have likely occurred in any event. *Murdaugh Volkswagen v. First National Bank of South Carolina,* 801 F.2d 719, 727 (4th Cir.1986) (emphasis omitted).

Thus, in *Murdaugh,* the court found that the plaintiff, a corporation, proved that the bank's wrongful dishonor of the plaintiff's checks, proximately caused the plaintiff's dissolution. Although the corporation was on the verge of bankruptcy, the jury found that the bank's actions led to the ruination of the dealership:

> Although the evidence was in conflict regarding the time that the financially-troubled company was placed on COD by its suppliers, the jury was entitled to resolve that conflict in favor of plaintiffs' being placed on a cash-only basis after the wrongful dishonor of the checks. It was also not unreasonable for the jury to find that the dealership's inability to purchase on credit was, in effect, the ultimate blow to plaintiffs' struggle for survival. The evidence, moreover, makes clear that the issue of the returned checks was viewed by the dealership's franchiser as a serious problem which figured prominently among its reasons for finally terminating the franchise.

*Id.* at 727. Again, it is obvious from *Murdaugh* that other factors may also "substantially" contribute to the harm without relieving the defamer of liability. Thus, under the facts of this case, the fact that Reynolds expressed having personality conflicts with Simon weakens in importance.

Undoubtedly, some of the evidence in this case suggests that factors other than the slander played a part in Reynolds' decision to fire Simon. Considerable evidence shows that Reynolds was having attitude problems with Simon and Reynolds states these problems as partial reasons for Simon's termination. (SR. 1658; 1594–1600). Reynolds also indicates that the *whole* Shearson affair bothered him, implying that even if he did not believe Simon was directly involved, the fact that the incident even occurred may have been grounds enough for him to terminate Simon. (SR.

1601). Nonetheless, despite the evidence of "other" reasons for Simon's termination, the question of whether the slander was itself a substantial reason for the termination remains.

The district court held that because Simon's termination occurred almost two months after Kujawski made the slanderous statement to Petroni, the statement could not have been a factor in Reynolds' decision to terminate Simon. This conclusion is not as obvious as it first seems. Reynolds testified that he did not fire Simon immediately after the phone call "on the advice of his attorney." (SR. 1656). The district court held that it was impermissible for the jury to infer from this statement that Reynolds decided to terminate Simon after hearing about the Shearson incident but temporarily kept Simon on in order to elicit Simon's cooperation in recouping losses from Shearson. There is no reason, however, to discount such an inference in face of the conflicting evidence as to *when* Reynolds actually decided that he was going to terminate Simon.

For instance, Fimberg testified that Reynolds decided that it was "time for new management" *after* Fimberg met with Simon in Florida. (SR. 2685). Reynolds testified, however, that as of October, 1984 he thought that his business relationship with Simon was "going to end." Despite ongoing personality conflicts, Reynolds also testified that as of September 1984 he had not made a firm decision to fire Simon, and that his decision was finally made when he learned of the "Shearson thing." (SR. 1594; 1600–01). In addition, Gershenson testified that Reynolds decided to terminate Simon *before* calling in Stanley Fimberg to investigate Reynolds' finances. (SR. 2455–56). Fimberg arrived on the scene in mid-November, not more than one month after the phone call and before Reynolds' financial status was fully investigated. Thus, it is entirely possible that Reynolds made a decision to fire Simon soon after the phone call but did not act on that decision for a few weeks. Because the evidence of *when* Reynolds decided to terminate Simon conflicts, the jury was

free to choose from among the evidence and arrive at its own conclusion. Our inquiry, therefore, must be whether, in relaying the "Shearson incident" to Petroni, Kujawski's slander, which charged Simon with direct involvement in the illegalities that took place with Reynolds' accounts, was "the final blow" to Simon's admittedly tenuous position as Reynolds' business manager.

Like the district court, we find it significant that there is no testimony from Reynolds that connects the slanderous statement to Simon's termination. Although Reynolds' testimony is vague and not at all conclusive, Simon bears the burden of proving by a preponderance of the evidence that the slander caused his termination. The nature of special damages are "such as really took place. They are not to be implied but are to be specifically proved." *Continental Nut Co. v. Robert L. Berner Co.*, 393 F.2d 283 (7th Cir.), *cert. denied*, 393 U.S. 923, 89 S.Ct. 254, 21 L.Ed.2d 259 (1968). In *Continental Nut*, the Seventh Circuit upheld the district court's grant of a JNOV for a slanderous statement that the plaintiff corporation claimed resulted in a loss of profits. The court held that, where the plaintiff knew the identity of the customers whose business it claimed to have lost, the plaintiff was required to prove that the "patronage withdrawn by the particular customer[s] ... was the result of the publication." *Id.* at 286. The court went on to say, "As the trial judge so aptly pointed out, the striking fact about the record in this case is that plaintiff has not produced the testimony of a single customer or former customers on these questions.... No customer, although all were well known to the plaintiff, was asked the questions; the jury was left to speculate." *Id.* at 286–87.

In this case, we agree with the district court that "Reynolds, whose testimony was of paramount importance in establishing what motivated him to terminate Simon, was never asked whether [the slanderous] statement was a factor." No one asked Reynolds exactly what about the Shearson incident bothered him in connection with Simon and whether his decision to terminate Simon after the "whole Shearson thing," was the result of a suspicion of illegality, or simply a recognition of mismanagement, or both. Instead Reynolds merely stated that he terminated Simon because "[i]t was a block house, wasn't it? It was falling apart.... There were incidents that were happening time and time again." (SR. 1658). From this testimony, the jury is left to speculate whether stating that Simon was directly implicated in an impropriety within a whole conversation that revealed major fraud and mismanagement of accounts for which Simon was responsible, produced or substantially contributed to Simon's termination. Unlike *Stevenson* or *Murdaugh*, where testimony revealed that the slander figured prominently in the minds of those who ultimately took adverse action against the plaintiffs, no evidence in this case shows that Reynolds specifically considered the slanderous statement in terminating Simon. Instead, the jury is left only with inference. Under these circumstances, the district court's reversal of special damages must be affirmed. *See Newton v. National Broadcasting Co.*, 677 F.Supp. 1066, 1069 (D.Nev.1987) (granting JNOV only as to lost profits award).

## IV. New Trial

Because we affirm the district court's grant of a JNOV only as to the award of special damages, we must address the court's conditional grant of a new trial. The district court granted a new trial on the slander claim based on insufficient evidence, the lack of proof of special damages and the "excessive" jury award.

■ Because we dealt extensively with the question of sufficient evidence in discussing the district court's grant of a JNOV, we will not discuss it again at this juncture except to say that a new trial is precluded on this issue because there was sufficient evidence on which the jury could have found that Kujawski's statement was slanderous. Turning to the question of special damages, we agree with the district court that there was inadequate proof to sustain the jury's special damages award and, as mentioned above, we affirm the

grant of a JNOV as to this award. Because the slanderous remark constitutes slander *per se*, however, we do not believe that this failure of proof necessarily requires a JNOV or a new trial with respect to the general and punitive damages awards. When a remark constitutes slander *per se*, general damages are recoverable without proof of economic harm so long as the plaintiff presents competent evidence of such harm. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974).

In this case, Simon testified that the accusation that he stole money from someone else was "a personal humiliation" that has "had a very devastating effect on me both personally and in my business career." (SR. 474). In addition, Simon's wife, Dona Simon testified that the slander had a noticeable effect on her husband. "He has always prided himself on his integrity, his honesty, and for his relationship [with Reynolds] to end in such a way, for Burt to think that my husband was a crook, for it to end on such a sour note like that and for him to never be able to discuss it with him or talk to him again is an experience that I don't think he will ever get over. It has—it has really crippled him, I think, creatively and financially. It has been a terrible drain on him, on both of us." (SR. 775–76).

█ This evidence is sufficient to demonstrate that the slander, which imputed to Simon more than gross negligence, caused an impairment of Simon's reputation, personal humiliation, and mental anguish and suffering. Nonetheless, in the face of the other information conveyed to Reynolds at the same time as the slander and in light of the fact that, contrary to the belief of the jury, the slander did not cause Simon any economic loss, we cannot justify the award of 1 million dollars for general damages. *Cf. Marcone v. Penthouse International Magazine for Men*, 754 F.2d 1072, 1079 (3d Cir.), *cert. denied*, 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985) (evidence of tarnished reputation should be considered as factor to mitigate the level of compensatory damages). Thus, we agree with the district court that the award is excessive as a matter of law. *See Machado v. States Marine–Isthmian Agency, Inc.*, 411 F.2d 584, 586 (5th Cir.1969), and "'shock[s] the conscience'" of the court. *Sykes v. McDowell*, 786 F.2d 1098, 1105 (11th Cir.1986) (citation omitted). Under these circumstances, this court has the inherent power to set aside the judgment or to direct the entry of an appropriate judgment by way of remittitur. *Handi Caddy, Inc. v. American Home Products Corp.*, 557 F.2d 136, 141 (8th Cir.1977).

In directing an appropriate judgment, we consider the cases of *Alioto v. Cowles Communications Inc.*, 430 F.Supp. 1363, *aff'd*, 623 F.2d 616 (9th Cir.1980), *cert. denied*, 449 U.S. 1102, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981) and *Newton*, 677 F.Supp. at 1066. In *Alioto*, the court awarded $350,000.00 to the plaintiff for a slanderous article impugning the plaintiff's fitness for public office. Recognizing that there is no mathematical formula for the award of general damages, the court considered "'the wide publicity given to the libel, the plaintiff's prominence in the community where he lives, his professional standing, his good name and reputation, his injured feelings and his mental suffering.'" *Id.* 430 F.Supp. at 1372 (citation omitted). In that case, a libelous article linked the former mayor of San Francisco to organized crime. The court found that the plaintiff was a prominent member of the community and of the legal profession. "His good name and reputation are unquestioned. He has also gained a national reputation.... Thus, the nationwide ... dissemination of the article, over 8 million copies of which were published, inevitably caused widespread harm to his reputation." *Id.* In light of this extensive harm, the court awarded $350,000.00 in general damages and this award was affirmed on appeal.

In *Newton*, the court held that a jury award of $5,000,000.00 for the damage that a slanderous broadcast caused to Wayne Newton's reputation was excessive. Although the court recognized that the plaintiff was not required to prove that damage to his reputation actually occurred, it held that the amount awarded must still be rea-

sonable. In light of the fact that the plaintiff did not show actual harm to his reputation, the court found that $50,000.00 "is the maximum amount that can reasonably be presumed...." *Id.* at 1069. The court also affirmed the jury's award of $250,000.00 for physical and mental suffering.

In the present case, Simon's reputation was already tarnished by the other facts of the Shearson affair. The slander was published only once and there was no evidence that the slander affected Simon's reputation in the community generally. Simon's testimony and the testimony of his wife reveal that while Simon was distraught at the implication that he had stolen money, this distress was in combination with his termination and the events caused by the whole Shearson affair. Unlike the *Newton* case, there is no evidence on the record that Simon incurred any physical ailments or medical expense due to the remark. Under these circumstances, we find that $250,000.00 is the maximum amount that can reasonably be presumed for Simon's general damages.

■ In addition, with the award of general damages, punitive damages may also be recovered. *Id.* While California law governs the substantive issues of the slander claim, under Georgia choice of law principles, issues of remedy are governed by the law of the forum state. *Menendez v. Perishable Distributors Inc.*, 254 Ga. 300, 302, 329 S.E.2d 149, 151 (1985) (rule in Georgia of lex fori controls all matters affecting only the remedy). Thus, we turn to Georgia law to discern the appropriateness of the punitive damages award.

■ The district court instructed the jury that, as a matter of law, there was no evidence that Shearson, in making the slanderous remark, acted with spite or ill-will towards Simon. (SR. 3351). The district court was referring, however, to Shearson's degree of care in verifying the statement and not to the "maliousness" of the statement itself. In other words, the court held there was no evidence that Kujawski

acted with the specific intent to cause Simon harm but left to the jury the question of whether Kujawski uttered the statement "in reckless disregard for its truth or falsity." (*Id.*) A defendant's degree of care in uttering a slanderous statement is different from common law malice which reflects whether the statement itself is "calculated to injure." *See Straw v. Chase Revel, Inc.*, 813 F.2d 356, 362–63 n. 8 (11th Cir.), *cert. denied*, 484 U.S. 856, 108 S.Ct. 164, 98 L.Ed.2d 118 (1987). Thus, common law malice is presumed from the character of the defamatory statement and has nothing to do with the defendant's state of mind. L. Eldredge, *The Law of Defamation*, § 6 at 25–26.

■ Under the facts of this case, Simon was required to prove "actual malice" in order to defeat Kujawski's conditional privilege in making the statement to Petroni. As discussed above, we uphold the jury's finding that Shearson acted with actual malice; that is, with reckless disregard for the truth or falsity of the statement. Under Georgia law, this finding authorizes the jury to award punitive damages because, at the very least, it comports with the punitive damages statute of OCGA § 51–12–5 [8], which requires that the defendant act with some degree of culpability greater than negligence, and because actual malice is a more exacting standard than is common law malice which would normally sustain a general and punitive damage award for a slander action between private parties. *See Colonial Pipeline Co. v. Brown*, 258 Ga. 115, 118, 365 S.E.2d 827, 830, *appeal dismissed*, —— U.S. ——, 109 S.Ct. 36, 102 L.Ed.2d 15 (1988); *Straw*, 813 F.2d at 363; *Williams v. Trust Co. of Georgia*, 140 Ga. App. 49, 51–52, 230 S.E.2d 45, 48 (1976). We must still address, however, the question of whether the punitive damages awarded in this case were excessive as a matter of law.

■ Under Georgia law, punitive damages are authorized for any tort "in which

---

**8.** In July of 1987, the Georgia legislature passed a statute limiting punitive damages to $250,000.00 in cases in which the defendant lacked

the specific intent to cause harm. *See* OCGA § 51–12–5.1. This statute, however, was enacted after the trial in this case.

there are aggravating circumstances, either in act or intention," in order "to deter the wrongdoer from repeating the act or as compensation for the wounded feelings of the plaintiff." OCGA § 51–12–5. In considering the appropriateness of a punitive damages award, the Georgia Supreme Court has held that the basis of the award is not so much the kind of tort committed as it is the egregiousness of the wrongful act. *Colonial Pipeline*, 258 Ga. at 122, 365 S.E.2d at 832 (emphasis omitted). Under this framework, we find that the award of punitive damages was also excessive. In this case, the district court specifically found that Shearson did not act with any ill will or hatred towards the Simon or with actual knowledge that the statement uttered was false. In light of the other events that transpired in relation to the Shearson incident, the slander did not cause Simon any actual loss nor did it grossly tarnish Simon's reputation. Thus, we find that in "keeping the verdict 'within reasonable bounds considering the purpose to be achieved as well as the ... defendant's [intent],' " and in considering the assets of the appellee, Simon is entitled to $1,000,000.00 in punitive damages as the maximum amount which the law will accept as a deterrence. *Curtis Publishing Co. v. Butts*, 351 F.2d 702, 719 (5th Cir.1965), *aff'd*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (reasonable for district court to remit 5 million dollar award in punitive damages to $400,000.00).

## V. Shearson's Counterclaims [9]

In its amended answer, Shearson asserted counterclaims against Simon based on potential claims of Reynolds' that Reynolds had assigned to Shearson as part of a settlement agreement. After Shearson presented its case, Simon moved for a directed verdict because, among other things, Shearson did not put evidence of the assignment into the record for the jury and therefore, Simon claimed, it failed to prove valid ownership of its claims. (SR. 3087).

The district court eventually granted Simon's motion, finding that Shearson failed to prove ownership of the claims Reynolds allegedly assigned to them; that the claims were barred by the affirmative defense of *in pari delicto;* and that the record failed to provide a rational basis on which the jury could apportion damages. (SR. 3150). Shearson appeals this decision claiming that the district court erred in directing a verdict in favor of Simon. Because we hold that Shearson failed its burden of proving valid ownership of its claims, we address only this issue in reaching our decision to affirm the district court's disposition of Shearson's counterclaims.

■ In general, the party that relies on an assignment has the burden of proving its existence and validity. *National Advertising Co. v. Sayers,* 144 Colo. 356, 357, 356 P.2d 483, 483 (1960) (idea that party who claims under an assignment has the burden of proving the assignment is "Hornbook law") and *Federal Deposit Insurance Corp. v. Barness,* 484 F.Supp. 1134, 1150 (E.D.Pa.1980) (assignee must prove validity of ownership of claim); *cf. Kershaw v. Kershaw Manufacturing Co.,* 209 F.Supp. 447, 455 (M.D.Ala.1962), *aff'd,* 327 F.2d 1002 (5th Cir.1964) (assignee proved validity of assignment by showing that release did not cancel assignee's claims). In order to put the plaintiff to proof, however, the opposing party must deny the existence or validity of the assignment either by general denial, *see, e.g., Goddard v. Gladstone,* 8 Misc.2d 624, 626, 168 N.Y.S.2d 99, 102 (1957), or by specific challenge. *See generally, McLean v. Morrow,* 137 S.W.2d 113, 115, 117–18 (Tex.Civ. App.1940) (general denial puts validity of assignment at issue). Otherwise, the assignment is considered admitted and the party asserting the claims need not put the assignment into evidence. *Id.* When put in issue, the ownership of assigned claims must be proven as a matter of fact. *See Federal Deposit Insurance Corp. v. W.H.*

---

**9.** A question arises over whether this claim is properly before this court as part of the district court's Rule 54(b) certification. Because the district court included Shearson's counterclaims in its Rule 54(b) certification order entering final judgment, (R–14–199), we will consider the merits of Shearson's appeal.

*Venture,* 607 F.Supp. 473, 476 (E.D.Pa. 1985); *Cummins v. Dixon,* 265 S.W.2d 386, 394–95 (Mo.1954). It is undisputed that Shearson did not offer any evidence of the assignment to the jury. The question becomes, therefore, whether Simon properly denied the factual validity of the assignment thereby putting the question of valid ownership in dispute.

In Simon's response to Shearson's motion to amend its answer in order to assert counterclaims, Simon stated: "Reynolds, as a *sine qua non* for accepting the settlement sum, was required by Shearson to execute an assignment of any and all claims he may have had against Plaintiff and others arising out of the transactions occurring with respect to Mr. Reynolds' Shearson accounts." (R1–29–5). After the district court allowed Shearson's counterclaims to go forward, however, Simon formally answered Shearson's allegation of assignment: "Plaintiff admits that Shearson is *purportedly* bringing the counterclaim as assignee of Burton L. Reynolds ("Reynolds"). *Plaintiff denies the validity of Shearson acting as an assignee and denies the legal sufficiency of said assignment."* (Emphasis added.) Thus, Simon did not deny that an assignment was *attempted,* but he did deny the validity of Shearson's ownership of the claims as an assignee and he therefore put the validity of the assignment at issue.

Simon's later treatment of the assignment in his motion for summary judgment and in his portion of the Consolidated Pretrial Order does not alter this analysis. While Simon addresses the merits of Shearson's counterclaims after admitting to the existence of an assignment in his motion for summary judgement, he does so for "purposes of the motion only." (Statement of Material Facts, R4–99–6, 7). In the Pretrial Order, Simon again states that while he recognizes that Reynolds was required to execute an assignment, he considered the assignment "void . . . and procured in bad faith." (R6–126, Ex. C p. 7). Such language does not contradict Simon's formal answer in which he gave notice that he challenged the validity and legal sufficiency of the assignment. Thus, the burden

fell on Shearson to prove that it validly owned the claims through a legally sufficient assignment.

The assignment was identified as an exhibit (D280) on Shearson's exhibit list in the Pretrial Order, (SR. 3148), and Shearson had the alternative of either putting the document into evidence or of providing evidence of the assignment through the deposition of Burt Reynolds. (SR. 3144–48). Although there was some mix-up as to whether Simon was suppose to read the portions of the deposition identifying the settlement agreement and the subsequent assignment, (SR. 3144–48), the bottom line is that they were not read to the jury and that Shearson knew that Reynolds' testimony, as read to the jury, did not include evidence of the assignment. (SR. 3148). Thus, it was incumbent on the defense to either read those portions to the jury itself or to offer into evidence a copy of the assignment.

■ When Shearson realized at trial that it had rested its case and that the absence of any proof of the assignment might be a problem, it moved the district court to reopen the record in order to add the assignment to the jury's collection of evidence. (SR. 3143–44). The district court denied the motion stating, "I think it is correct that I can't just reopen the record to put the assignment document in by itself. I believe all of the documents executed in connection with the assignment would have to go in." (SR. 3148). The documents surrounding the execution of the assignment included draft affidavits that were potentially damaging to Shearson.

The district court's refusal to reopen the record is subject to the "abuse of discretion" standard. *United States v. Esle,* 743 F.2d 1465, 1475 (11th Cir.1984). The district court did not abuse its discretion in this case. Shearson elected not to put the assignment into evidence for tactical reasons because, in so doing, it "would open a Pandora's box vis-a-vis all th[e] draft affidavits." (SR. 3146). Shearson cannot now complain because the district court later

refused to make the assignment part of the record to be examined by the jury without the assignment's "baggage."

Shearson also argues that it did not realize that the validity of the assignment was in issue. It claims that the district court erred in refusing to reopen the record to allow evidence of the assignment because Shearson "reasonably relied on the fact of the assignment as admitted." While this argument has equitable appeal, it cannot stand in face of the plain language of Simon's answer to Shearson's counterclaims. Through Simon's answer, Shearson was put on notice that its status as assignee was being challenged. There was nothing more that Simon was required to do. He never renounced this stance; thus, Shearson was required to come forward with proof. Accordingly, the district court grant of Simon's motion for a directed verdict is affirmed.

In sum, the district court's grant of a JNOV is AFFIRMED with respect to the special damages award and REVERSED with respect to the general and punitive damages award; the district court's grant of a conditional new trial is AFFIRMED with respect to the issue of general and punitive damages only, unless the appellant files a remittitur within sixty (60) days of all sums except $250,000.00 in general damages and $1,000,000.00 in punitive damages; the district court's directed verdict on the counterclaims is AFFIRMED.

AFFIRMED IN PART AND REVERSED IN PART.

### APPENDIX

#### Petroni's Notes of the Phone Call from Kujawski

They said there's an account in Little Rock, Arkansas, one and a half years old, Burt Reynolds' municipal bond account, 3 to 4 million dollars average balance. The advisers were Labe Mell, Sandy Simon, Keith Bell, who worked for Mell, and James Malte. They told me that on October 9, 1984 a Shearson employee attempted to withdraw $489,000 in checks. These checks were to Keith Bell in the amount of $58,000; Labe Mell in the amount of $121,-000; Dona Simon in the amount of $14,600; Sala Sawaya in the amount of $8,400; Richard Simon in the amount of $13,200; Richard Machek in the amount of $25,000; James Malte in the amount of $56,000; LBM Services in the amount of $82,000; and Burt Reynolds in the amount of $108,-000.

The checks were never issued, and there was no check for Sandy Simon or Eassa Properties Corporation, although the October 9th, 1984 letter had mentioned them as possible payees.

These checks were to be issued pursuant to a letter from Sandy Simon to Shearson. A Shearson employee says, however, that he signed Sandy Simon's signature to that letter, but he said he signed it on Sandy Simon's instructions.

The Shearson Little Rock branch manager presumably called Sandy Simon who confirmed that and said his letter would be sent by federal express immediately. It never arrived in Little Rock. The employee, Michael Swofford, was suspended for having signed the letter.

In reviewing Burt's account, they found that other funds had previously been wired out of this account to a Bank in Atlanta. On August 6, 1984, $162,500 was wired to the National Bank of Georgia for the account of LBM Services, agents.

On September 4, 1984, $243,000 had been wired to the National Bank of Georgia for the account of LBM Services, agents.

Money was wired from the National Bank of Georgia to Shearson in New York for the personal account of Labe Mell. There were a series of checks, one for $30,000 on September 13th, '84; one for $52,700 on July 19th, 1984; one for $16,000 on August 20th, 1984; and they said there may be more.

They also said there were sizeable commodity losses, $210,000 for Burt in the Little Rock account. Also, there were losses in the personal accounts for Mell, Simon, and Bell. They said the total losses in commodities is slightly more than $700,000.

Swofford said that he was only following instructions of the investment advisors.

He said he was asked for kickbacks to the advisers, and that they were paid. He remembers a check to Bell for $30,000 paid out of his own personal account. Shearson hadn't actually seen his personal account at that time. Swofford also says that the advisers would give him big checks for him to deposit in his personal account with instructions to send series of checks to other individuals.

He says he was told not to ask where the money came from. A power of attorney in Simon's name is the only document in the file at Shearson in Little Rock that it was used to open the account. Then I have names of the people I talked with; Peter Kujawski, who is deputy general counsel of Shearson, and Jack Intemann from Shearson compliance.

Then there was a footnote they had received a phone call the day before from a reporter in Little Rock asking about the firing of Swofford. They had talked to Mell who denies giving Swofford any instructions, receiving any kickbacks, says the broker exceeded his authority in the commodity account, and he denied knowledge of transfers to Shearson in New York.

They had called Sandy Simon but hadn't talked to him.